UNITED STATES of America, Appellee,

v.

Alastair KYLE, Clinton Gardner and Toys of the World Club, Inc., Appellants.

No. 378, Docket 25064.

United States Court of Appeals Second Circuit.

Argued June 9–10, 1958.

Decided July 28, 1958.

See also, 21 F.R.D. 163.

Rudolph Stand and Frank Aranow, New York City (Rudolph Stand and Frank Aranow, New York City, of Counsel), for appellants, Kyle and Toys of the World Club, Inc.

Engelman & Hart, New York City (Jack Hart and Myron Engelman, New York City, of Counsel), for appellant, Clinton Gardner.

Cornelius W. Wickersham, Jr., U. S. Atty., for Eastern District of New York, Brooklyn, N. Y. (Warren Max Deutsch, Asst. U. S. Atty., Glen Cove, N. Y., of Counsel), for appellee.

Before CLARK, Chief Judge, PICKETT, Circuit Judge, and RYAN, District Judge.

RYAN, District Judge.

Defendants Kyle and Toys of the World Club, Inc. appeal from a judgment of conviction on a seven-count indictment charging them with conspiracy and six substantive violations of the mail fraud statute (Title 18 U.S.C.A. Secs. 371, 1341 and 1342). Defendant Gardner appeals separately from the conspiracy conviction—he was acquitted on the substantive counts. The individuals received prison sentences: Kyle one year and a day to run concurrently on each count; Gardner, six months, and the corporate defendant a fine of a total of $1,400 on all counts.

The evidence produced on the trial was undisputed; none of the defendants called any witnesses and only Gardner testified in his own defense. All the defendants on this appeal attack the sufficiency of the evidence and in addition

Kyle and Toys of the World Club urge error on the part of the trial court in (1) excluding evidence of Gardner's intent, (2) curtailing cross-examination of a Government witness, and (3) admitting collateral prejudicial matter; they also urge prejudice resulting from the prosecutor's summation. Defendant Gardner urges error in the court's exclusion of evidence material to his defense and in its charge on criminal intent.

The indictment charged that beginning prior to June, 1955 and continuing through August 3, 1956 (the indictment date), defendants did defraud and obtain money by the mailing of false and fraudulent circulars selling and offering to sell membership in a gift toy club known as Toys of the World Club, Inc. The fraudulent statements contained in the circulars were alleged to be (1) that defendants had a present supply of toys for the subscription periods, (2) that they were able to make full refund to any dissatisfied subscriber and (3) that certain eminent persons had endorsed the plan, when in fact defendants knew they had no such supply of toys, that they were financially incapable of making any refunds as promised and that they had no such endorsements. Each of the six counts charges a separate mailing to a named person during the period of September through December, 1955. The seventh count charges a conspiracy among the three defendants to use the mails to execute their fraudulent scheme and obtain money by false pretenses through the mailing of circulars and "lulling" letters and cards to named subscribers.

The evidence was that in November, 1954, defendants Kyle and Gardner as president and secretary-treasurer, respectively, began a mail order toy business under the name of "Toys for a Year, Incorporated," which in March, 1955 became defendant Toys of the World Club. The plan as described in the brochures sent out consisted in soliciting paid up subscriptions on a 3-month ($7), 6-month ($12) and 12-month ($22) basis for the receipt by the subscriber of a distinctive

toy from a foreign country for each month of the subscription period, and in addition, a free introductory toy—a Tyrolean Village block set. This toy it was promised in the brochure would be mailed to the subscriber at once and if it did not satisfy the subscriber, upon demand defendants would at any time make a full refund of the amount paid for the subscription for any toys not already shipped. The brochure also represented that the club had an advisory panel who approved the story pamphlets which would accompany each toy describing its background.

Beginning in June, 1955, defendants commenced mailing out systematically hundreds of thousands of these brochures which reached the staggering figure of seven million by December and in response to which they received a total of $385,000. in paid subscriptions. At the time of this mailing in June, 1955, defendants' eight-month old business was operating at a loss of about $42,000 and was in default to its trade creditors and to subscribers of the former plan (Toys of the Year), on the bonus toy as well as on toys subscribed for. Defendants' insolvency grew steadily; by October, 1955, they were completely out of cash and the deficit had reached the sum of $264,000, by December, 1955 it was $355,000 and continued to increase until the discontinuance of operations early in 1956. Hand in hand with this mounting, hopeless insolvency during this time went the pouring into the mails of millions of circulars promising toys in exchange for money, and this, in spite of default in delivery of toys and complaining letters from subscribers. During the entire period that Toys of the World operated there was no one subscriber who received all the toys for which he had paid. In order to appease impatient subscribers, defendants sent out two types of letters in which they gave as reasons for not sending the bonus toy difficulty in obtaining the particular wood needed and delays in manufacture abroad. The real reason, as the jury found defendants were only too well aware, was their inability to prepay for the toys to be imported by placing letters of credit with the manufacturer abroad in accordance with the agreement they had made; they knew that without such prepayment there was no supply of toys available for subscribers. In fact, defendants during this six-month period (June-December, 1955) were unable to pay the printer for their brochures and were forced to contract with a new printer; numerous checks in large denominations in purported payment of trade debts and toys were returned for "insufficient funds" with monotonous regularity and the stopping of payment on checks issued was a regular business practice of the company. In October, 1955, they were unable to pay the employees' quarterly withholding tax. They refunded no part of any money collected and yet they continued to solicit subscriptions. In November, 1955 they sent over three million circulars guaranteeing delivery of the free toy by Christmas, when performance, it was obvious, was impossible as they had stopped payment on a check sent to pay for these very toys. Finally, in December, 1955, defendants Gardner and Kyle took over $50,000 of subscribers' checks to a check cashing agency where they falsely certified in writing that they were the sole stockholders and authorized to cash the checks, the proceeds of which they then deposited in a non-corporate account in Canada over which Kyle had sole control, and for these funds they have never accounted. Any attempted last minute explanations as in the Kyle reply brief may not be considered by this Court.

Defendant Gardner's active and knowing participation with Kyle and the corporation in the swindle is amply sustained by the evidence. He was secretary-treasurer of the corporation and remained so until close to the end in December 12, 1955, at a salary of $1,000 per month; he helped draft the brochures and the lulling letters to the subscribers; he employed his talents as a mail expert to conduct the intensive campaigns and to estimate the returns; he stopped payment on checks; he accompanied Kyle

to the check cashing agency and falsely certified as to their control and authority; he deposited some of these moneys in the non-corporate account; he was fully aware of the company's financial condition for he made it a three-month loan at 80% interest and drew up a memorandum of its financial condition. Whether he be called a mailing consultant or an officer and director of the corporation his was a knowing and active participation in the operations of the defendant club. The evidence of the corporate insolvency, its continuing defaults and regular systematic solicitation and receipt of money through the making of promises it knew it had not and could not fulfill and its retention of these substantial sums in the face of such knowledge more than justified the jury in finding a scheme to defraud by the use of the mails and a finding that Gardner was a party to the scheme. United States v. Tellier, 2 Cir., 1958, 255 F.2d 441; United States v. Epstein, 2 Cir., 154 F.2d 806, certiorari denied sub nom. Epstein v. United States, 328 U.S. 858, 66 S.Ct. 1350, 90 L.Ed. 1629; United States v. Mortimer, 2 Cir., 118 F.2d 266, certiorari denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496; United States v. Fradkin, 2 Cir., 81 F.2d 56, certiorari denied 297 U.S. 720, 56 S.Ct. 598, 80 L.Ed. 1005; Bentel v. United States, 2 Cir., 13 F.2d 327; Knickerbocker Merchandising Co. v. United States, 2 Cir., 13 F.2d 544.

■■ Defendant Gardner was charged with fraud and evidence of his intent by direct testimony on his part as to his belief and motive was material; such evidence if believed by the jury might tend to repel the inferences of fraudulent intent revealed by his activities. Miller v. United States, 10 Cir., 120 F.2d 968; Crawford v. United States, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465; Sparks v. United States, 6 Cir., 241 F. 777; Buchanan v. United States, 10 Cir., 233 F. 257. Gardner during cross-examination by Kyle's counsel was interrogated concerning expected returns from pre-Christmas mailings based on lists and estimates prepared by the witness; the

returns had fallen over 50% below his estimates. The two questions asked of him which were proper and to which he should have been permitted to make answer were whether his predictions were based on "sound business methods" and on an "honest opinion." Although objection was sustained at the time this line of questioning was not precluded by the trial judge; ample opportunity was presented to counsel right after that to renew this line of inquiry when over the Government's objection he introduced in evidence and questioned Gardner extensively from the chart of estimated returns and mailings prepared by him (Ex. JJ); still further opportunity was presented to Gardner's counsel when on redirect he specifically examined the witness concerning the chart. Although this appears to have been the logical time and place to ask the questions objected to neither counsel availed himself of it. In any event, the importance of this testimony at that precise moment when weighed with the evidence in the entire case fades, for it related only to the last three mailings and other evidence showed this witness's Gardner participation in the four prior mailings and in diverse corporate activities; he had moreover on his direct examination testified at length as to his knowledge and motives.

■■ Six exhibits were received in evidence through the Government's witness Meesig, a postal inspector and accountant, which were summaries of three balance sheets and three profit and loss statements drawn from the corporate books in evidence. The books had been established by the company bookkeeper as all the corporate books kept in the regular course of business. These summaries, it was clearly shown, were based only on what was reflected in the books in evidence. United States v. Weinbren, 2 Cir., 121 F.2d 826; United States v. Park Avenue Pharmacy, 2 Cir., 56 F.2d 753. Extensive cross-examination as to the accuracy of the summaries and the books was permitted; there was no evidence that the corporation had assets or liabilities other than those recorded on

564

the books, and there was consequently no reason for permitting counsel to cross-examine on items not contained in the books, save to promote confusion and argue with the witness. The wide latitude favored in cross-examination does not extend to matters not in evidence; if defendants had anything to controvert the witness's testimony they could have called an accountant of their own. United States v. Schenck, 2 Cir., 126 F.2d 702, certiorari denied sub nom. Moskowitz v. United States, 316 U.S. 705, 62 S.Ct. 1309, 86 L.Ed. 1773.

■ Evidence of unpaid bills, demands for payment from creditors, checks returned for insufficient funds and because payment had been stopped and the testimony of creditors was proper and relevant on the question of the financial ability of the defendant corporation to perform its promises and defendants' knowledge of it, as was also the evidence of the diversion of checks to the Canadian non-corporate account. All this was material on defendants' intent and absence of good faith. United States v. Epstein, supra. There was no objection taken then by either defendant as presumably they realized that it was relevant.

■ What defendants now characterize as "inflammatory and personal vituperation" and a "heated appeal to passion" by the prosecutor on summation apparently failed to stir either of them or their counsel at the time of the utterances into voicing an objection or a request for a direction from the court. Rule 51, Fed.R.Cr.P., 18 U.S.C.A. The reference to two of the jurors by name by the prosecutor in the course of an argumentative illustration was innocuous; the comment on the appearance of the defendants was obviously a rebuttal of their counsel's description of them as "misguided" "immature young men." It added nothing to the case and might have been better omitted but it was certainly not "injurious to the accused." Sparks v. United States, supra, 241 F. 790.

■ Gardner had testified as to his great interest and activity prior to the indictment period in a completely unrelated venture—the publishing of a magazine "Monthly Publications." There was no dispute as to this by the Government; the evidence showed that Gardner was engaged in both activities simultaneously although deriving income only from the defendant corporation. Details of his publishing enterprise had nothing to do with his guilt or innocence of the charge for which he was being tried and this testimony was properly excluded.

■ Finally, and on this appeal for the first time, Gardner objects to a portion of the charge defining fraudulent intent. Experienced trial counsel neither took exception to the charge nor made request for further instructions even after specific inquiry by the court. Rule 30, Fed.R.Cr.P.

The instruction complained of, isolated from the rest of the charge, reads:

"It is not necessary to constitute a fraud that an individual making a false statement should know precisely that it is false. It is sufficient if it be false and if he made it recklessly and without an honest belief in its truth or without reasonable ground for believing it to be true" (R. 1130–31).

These words, particularly "recklessly" and "without reasonable ground for believing it to be true" would, standing alone, eliminate good faith as a complete defense, if established, to the crime of fraud. That conscious knowing intent to defraud is one of the two essential elements of the mail fraud statute has long been established. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L. Ed. 709; United States v. Kram, 3 Cir., 247 F.2d 830; Silverman v. United States, 5 Cir., 213 F.2d 405, certiorari denied 348 U.S. 828, 75 S.Ct. 46, 99 L. Ed. 653; Knickerbocker Merchandising Co. v. United States, supra; Sandals v. United States, 6 Cir., 213 F. 569. But this instruction was preceded and followed by other instructions correctly setting forth the requirements which the jury would have to consider before it could find defendants guilty. Thus, the

565

trial judge charged that intent to commit a fraud or make a false promise is an essential element, that without it there can be no crime, that the mere fact that defendants were unable to perform their obligations is no crime, that if they acted honestly and with a justifiable belief and in good faith this would be a complete defense. Any confusion from this inconsistency (probably more apparent to the legal mind than to that of the layman) which might have resulted could have been cleared up by timely request for further instructions. Counsel's silence, while undoubtedly a waiver of their right to bring this issue up now, Rule 30, supports our conclusion that the charge when heard in its entirety correctly and fairly stated the law and that the effect of the language complained of was not such as to permit a wrong conclusion on the part of the jury (Miller v. United States, supra), or tip the scales in favor of conviction. Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L. Ed. 1495; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

The conviction is affirmed.