336 F.2d 1003
 UNITED STATES of America, Appellee,
v.
Isidore PRESS, alias John Grady, T. C. Fry, Jr., alias
Matthew Grady, Buy RiteBuyers Club, Inc., Factory Supply
Co., Inc., Standard Distributors, Inc., andAmerican
Wholesalers, Inc., Defendants-Appellants.
 No. 306, Docket 28621.
 United States Court of Appeals Second Circuit.
 Argued March 4, 1964.
Decided Aug. 11, 1964.
 
 Joseph F. Radigan, U.S. Atty., for District of Vermont (John H. Carnahan, Asst. U.S. Atty., Michael P. Epstein, Atty., Dept. of Justice, of counsel), for the United States.
 Max Feigin, New York City, and Ryan, Smith & Carbine, Rutland, Vt., for Isidore Press and Buy Rite Buyers Club, Inc., Factory Supply Co., Inc., Standard Distributors, Inc., American Wholesalers, Inc.
 Bernard Burlakoff, Westbury, Long Island, N.Y., for T. C. Fry, Jr.
 Before MOORE and FRIENDLY, Circuit Judges, and DIMOCK, District judge.*
 MOORE, Circuit Judge:
 
 
 1
 Isidore Press, T. C. Fry, Jr., Buy-Rite Buyers Club, Inc., Factory Supply Co., Inc., Standard Distributors, Inc. and American Wholesalers, Inc. appeal from judgments of conviction entered upon a jury verdict in the District Court for the District of Vermont. The individual appellants were found guilty of 24 counts under the Federal Mail Fraud Statute, 18 U.S.C.A. 1341, and of one count of conspiracy, 18 U.S.C.A. 371. The corporations were convicted on the conspiracy count. The indictment named, in addition to appellants, Lawrence Press, Selmajane Stuchell and William Stuchell. Defendant Lawrence Press was acquitted of the conspiracy charge and has not appealed from his conviction on the mail fraud counts. Selmajane and William Stuchell were acquitted on all counts.
 
 
 2
 Count 1 of the indictment charged that the individual defendants, while managing and operating the corporate defendants (October 1960 to the date of indictment, June 27, 1962), unlawfully devised a scheme and artifice to defraud by 'obtaining money * * * from the class of persons to be defrauded by means of false, fraudulent and misleading pretenses, representations, and promises made by Buy-Rite Buyers Club, Inc., and the (individual) defendants, the defendants well knowing at the time that the pretenses, representations, and promises were false, fraudulent, and misleading when they were made.' Count 1 cited with great particularity magazine advertisements, promotion literature and numerous other aspects of the alleged scheme which were repeated by reference in counts 2 through 77. Counts 1 through 77 charged the receipt of specific pieces of mail and telephone calls all in furtherance of a scheme to defraud in violation of 18 U.S.C.A. 1341, 1342, or 1343. Count 78, which included the corporate defendants, was for conspiracy, and alleged as overt acts the specific transactions enumerated in counts 1 through 77. Fifty-three of the 78 counts, including those charging a violation of 18 U.S.C.A. 1342 and 1343, were dropped by the Government; thus, there remained 24 substantive counts and one conspiracy count for the jury.
 
 
 3
 It is undisputed that appellants Press and Fry were the central figures in the appellant corporations. They were engaged in mail-order merchandising. For a yearly membership fee, solicited through volume mailings and magazine advertisements, appellants undertook to supply members with various purchasing benefits including catalogs from which merchandise might be selected at costs substantially below retail. Headquarters for these enterprises was in Lodi, New Jersey, and the warehouse was located in nearby Paterson. While the Government's case necessarily covered the overall operation of the appellant corporations, it centers on the facts surounding the business of Buy-Rite Buyers Club, Inc.
 
 
 4
 Appellants organized Buy-Rite, a Vermont corporation, in Bennington, Vermont in the latter months of 1960, ostensibly to take advantage of the absence of Fair Trade laws in Vermont. They leased a small office, took a post office box, hired three or four people (including the Stuchells) for clerical help and opened a bank account. Activities in Vermont were generally limited, however, to processing mail and forwarding it to New Jersey. Beginning in March and continuing until December of 1961, Buy-Rite conducted a campaign of magazine advertisements and bulk mailings of solicitation literature. During that period a total of 3,600,000 pieces of the basic promotion matter was mailed. All mailing was done in the New York City area, but the return addresses and letterheads gave the Bennington office.
 
 
 5
 The solicitation literature must be reviewed in some detail. It consisted of four items: a four page covering letter, a yellow 'Factory Price List,' a four page blue flyer and a two page combination membership application form and club member order blank. Each of the four items was an artfully drawn document trumpeting in flamboyant terms the merits of Buy-Rite membership. In the unlikely event that recipients had pored meticulously and critically through these enticing circulars they might well have been perplexed as to exactly what Buy-Rite would deliver for the seven dollar yearly fee.
 
 
 6
 The four page covering letter, signed by appellant Fry as 'Matthew Grady, Membership Director,' explained that 'buying right' with Buy-Rite enabled one to select from a vast assortment of commodities at prices '25% BELOW wholesale resale quotations to retail dealers.' As 'solid evidence' of the merits of Buy-Rite, the letter urged recipients to take advantage of the order blank and 'Factory Price List'; Buy-Rite's references, which were said to include Dun & Bradstreet, 'are the best,' the letter continued, and they would affirm that Buy-Rite was a 'bona fide organization' which dealt 'reliably, promptly and honestly.' The seven dollar yearly membership fee would provide five basic services:
 
 
 7
 ',1. You can buy directly from us all the merchandise we offer STRICTLY at Factory or Importers' quotations to wholesalers. 2. As a BUYERS CLUB we publish a comprehensive BLUE BOOK BUYERS GUIDE * * * (which) directs you to other merchandise sources * * * AT THE LOWEST PRICES OUR RESEARCHERS HAVE TURNED UP. * * * 3. We cause to be sent to you by other firms or enable you to secure from other firms a whole host of catalogs * * * price lists. * * * 4. We operate a consultation and quotation service for ONE FULL YEAR for our club members. 5. We function as a unique introduction service and as such, offer this. Upon joining our club we'll send you $14 in CREDIT CERTIFICATES. These are good with other firms. * * * THESE CERTIFICATES ARE JUST AS GOOD AS CASH.'
 
 
 8
 'YOU WON'T LOSE A CENT WITH US IN ANY EVENT.' continued the letter, and 'if you aren't FULLY SATISFIED * * * IF YOU ARE NOT WITHIN THIRTY FULL DAYS CONVINCED THAT ITS VALUE IS MUCH MUCH GREATER THAN A.$7.00 membership fee, then just return everything to us. We don't ask questions. We'll promptly refund you membership fee FULLY.'
 
 
 9
 The factory price list contained about 600 products, many bearing well-known nationally advertised trade names. Retail, wholesale and 'factory' prices were listed, but the products were available to Buy-Rite members at 'factory' prices. Prospects were assured that 'most orders are shipped complete from our own warehouse within 24 hours after receipt.' The four-page blue brochure in the Buy-Rite material further developed the benefits set forth in Matthew Grady's covering letter. 'A huge catalog' of over 700 pages was described as one of the many features included in the membership fee, and the prospect was asked: 'How much more do you feel such a catalog is worth when you can buy substantially all its contents at factory or importers' prices?' The brochure also discussed the 'Buy-Rite Blue Book Buyers Guide,' the Buy-Rite consultation and quotation service and the $14.00 in credit certificates. The fourth item included in the solicitation package was the membership application form. Listed there among the numerous membership benefits was 'an introduction to a unique Factory Buying Plan thru which (the member) can buy over 20,000 items. * * *' in addition to a 'tremendous color catalog exceeding 700 pages. * * *' to be used through the Factory Plan.
 
 
 10
 Sometime after the new Buy-Rite member had parted with his seven dollar membership fee, he again received a letter from Matthew Grady (Fry). This letter stated that under separate cover the member could expect to receive, among other things, introductory literature to a 'bona fide Factory Buying Club' and a wholesale catalog of around 700 pages from appellant Standard Distributors, Inc. Shortly, the situation became clear when the member received a letter from appellant Factory Supply Company, explaining that Buy-Rite had requested Factory Supply to forward a copy of its Factory Buying Plan. Because of their Buy-Rite membership, the fee for the Factory Buying Plan was reduced from $18.75 to $13.75. 'Why should you join the Factory Buying Club?' the letter asked.
 
 
 11
 'As a Buy-Rite member you can buy only about 2,000 items from them at Factory prices. But, as a member of Buy-Rite you have received several catalogs, notably a large 700 page wholesale catalog containing well over 12,000 items. * * * We supply EVERY item in this large catalog PLUS THOUSANDS MORE. * * * YOU'LL RECEIVE the following additional material: 1. A comprehensive Master Factory Price Index showing Factory or Importer's quotations on the items in the large 700 page catalog. * * *'
 
 
 12
 Buy-Rite members thus learned that the 20,000 items at factory or importers' quotations could be purchased only with the 'Master Factory Price Index' obtained at the expense of joining another plan for $13.75.
 
 
 13
 That members were misled by the initial solicitation material was admitted by appellant Press, who testified that Buy-Rite members inquired as to when they would receive the 700 page catalog, 'so they could buy the 20,000 items at factory cost,' and that 'it became evident that some of the people who were reading the literature, didn't fully understand, or weren't reading all of the literature. * * *' Buy-Rite, therefore, distributed the so-called 'disclaimer letter' wherein Matthew Grady (Fry) explained:
 
 
 14
 'I hope you are wise enough to realize that $7 cannot possibly cover an offering of 20,000 items. In our literature we stated we would introduce you to Factory Buying Club. This Club does sell some 20,000 items at Factory or Importer's quotations. You'll receive this offer from Factory Supply Company * * *. We managed to secure a $6 consideration against a membership in this Factory Buying Club in your behalf.'
 
 
 15
 A large part of the Government's proof was devoted to the manner in which Buy-Rite handled orders from members. Those employees in the Bennington office did little more than process orders and correspondence and fend off telephone inquiries by saying that the fictitious 'Mr. Grady' and his equally fictitious associates were 'in the warehouse' or 'on the road' and could not be reached. Replies to complaints of undelivered merchandise were evasive, particularly where refunds were demanded. More than thirty disillusioned Buy-Rite members took the stand and described their persistent efforts to secure refunds of payments and membership fees after having waited months for merchandise that was never delivered. They also told of what the solicitation material had led them to believe Buy-Rite offered. In addition, officers of a Chamber of Commerce organization, the Greater Bennington Association, testified that a large number of complaints had been received by their office and that they had been called to Buy-Rite's attention.
 
 
 16
 Three witnesses took the stand for the defense. B. D. Venner, a 'drop shipper,' said that on one occasion he had shipped merchandise to a Buy-Rite customer who had testified for the Government but that Railway Express had lost or misplaced the shipment. While Venner said that he had put a 'tracer' on this shipment, he admitted that he had made no attempt to follow it up with Railway Express even though the merchandise was not delivered. David J. Raibert, a Certified Public Accountant and appellants' 'business adviser' testified that the four corporations comprised one integrated economic group, and that they were financially responsible. Raibert had conferred frequently over problems with postal authorities and with Dun & Bradstreet. He described generally the sudden growth in business in mid-1961 and said he had arranged for the installation of electronic IBM equipment to speed customer service.
 
 
 17
 Appellant Press told of his background in merchandising the growth of his mail order business, the difficulties experienced in obtaining competent help, the engagement of an efficiency expert and of conferences with his lawyer and a Postal Inspector wherein he sought to alleviate Buy-Rite's severe growing pains. Press insisted that his intentions were honest, and his lengthy testimony pictured the good-faith efforts of enterprising businessmen to keep pace with the enormous response which greeted their merchandising plan. Any difficulties encountered by customers, he asserted, were due to careless business methods and inadequate clerical help and did not reflect the existence of a fraudulent scheme.
 
 
 18
 On this appeal appellants urge numerous points for reversal: 1) the guilt of the defendants was not established beyond a reasonable doubt, that the Government's evidence was entirely circumstantial and did not exclude every hypothesis of innocence; 2) prejudicial hearsay evidence of customer complaints was improperly allowed; 3) various errors in the court's charge; 4) that appellants were victims of local prejudice which was not remedied by the court's charge; 5) that the court erred in allowing the indictment to go to the jury room; and, 6) that appellant Fry was deprived of a fair trial because his original counsel withdrew from representation of Fry but continued as counsel for co-defendants with adverse interests.
 
 Sufficiency of the Evidence
 
 19
 We find no merit whatsoever in appellants' assertion that the evidence was insufficient to support the jury's verdict of guilt. Quite to the contrary, this is not even one of the 'close' cases arising under the Mail Fraud Statute with which we have expressed particular concern lest defendants be at the mercy of embittered purchasers whose hopes for bargains have been thwarted. See, e.g., United States v. Baren, 305 F.2d 527, 533 (2d Cir. 1962). A jury has had an opportunity during a long trial to hear many witnesses including the defendant Press and to evaluate their testimony, and by its verdict it has found certain defendants were guilty of fraudulent practices. An appellate court must not attempt to usurp the function of the jury. On appeal the facts must be considered in a light most favorable to the government, United States v. Tutino, 269 F.2d 488, 490 (2d Cir. 1959), and 'all permissible inferences which tend to support the judgment' must be drawn. United States v. Kane, 322 F.2d 787, 788 (2d Cir. 1963).
 
 
 20
 It is undisputed that Press and Fry both took part in framing the literature they caused to be sent through the mails. We think this material such that the jury would have been warranted in concluding that it was calculated to deceive. Thus, a prospective Buy-Rite member was led to understand that for.$7.00 he would receive an extensive 700 page catalog and that he could make purchases from that catalog at substantial savings. This was not true. Although most members did receive a 700 page catalog, it was at best a hollow offering since they were not entitled to make purchases from this catalog at the savings anticipated. The initial mailing in itself, therefore, was some evidence from which the jury could infer that appellants knowingly engaged in a scheme to defraud by inducing recipients to pay.$7.00 for benefits appellants knew not to be included in the offer. More damning, however, were the mailings which followed the initial promotion literature. Appellant Press admitted that some recipients had misunderstood what was to come with club membership. To dispel this confusion, the 'disclaimer' letter was ordered and distributed. The jury might well have thought that at this point, if appellants were acting in good faith and had only been too enthusiastic in otherwise legitimate sales puffing, they should have made appropriate changes in the promotion material so that others would not be similarly misled. But even after the 'disclaimer' was printed, appellants had the solicitation material reprinted in substantially greater volume. And thereafter, the 'disclaimer' letter was again printed and distributed.[1]
 
 
 21
 In addition to the evidence going to the content of appellants' mailings, the jury might have thought it of some moment that at a time when appellants' office force was drastically understaffed and, on appellants' own theory, inefficient in filling orders and otherwise providing the advertised services, these solicitation materials continued to assert that 'most orders are shipped * * * within 24 hours after receipt.' It is clear beyond doubt that this was a knowing misstatement of fact, and the jury could well have found further that it was intended to create an expectation of a quality of performance which the appellants knew they could not satisfy. Finally, the manner in which customer complaints were handled might have led the jury to find that appellants planned to outlast dissatisfied members, retaining purchase payments and membership fees without making efforts to carry out the obligations that had been incurred. Cf. United States v. Kyle, 257 F.2d 559, 562 (2d Cir. 1958), cert. denied, 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1959). There was, in sum, sufficient evidence from which the jury might have found that appellants knowingly and wilfully embarked on a scheme to defraud in the course of which they made representations reasonably calculated to deceive persons of ordinary prudence and comprehension. See Silverman v. United States, 213 F.2d 405, 407 (5th Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653 (1954).
 
 
 22
 Closely allied with appellants' claim of insufficiency of the evidence is the argument that to convict on circumstantial evidence the direct evidence must exclude every reasonable hypothesis of innocence, and that the direct evidence here overwhelmingly shows appellants' good faith. Appellants submitted a request to charge to this effect which was refused. As we said in United States v. Tutino, supra, 269 F.2d at 490, 'this circuit has never held that circumstantial evidence, to be sufficient to convict, must exclude every reasonable hypothesis of innocence to be drawn from the evidence.' The Supreme Court, in Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) has approved of this view. Here, it was for the jury to say whether or not the evidence supported appellants' defense of good faith.
 
 Evidence of Member Complaints
 
 23
 Appellants urge that the convictions must be reversed because the trial court erroneously admitted the testimony of witnesses Short, Hicks and McAvoy that they had received numerous letters from members expressing dissatisfaction with various facets of the Buy-Rite operation. Since appellants did not have the opportunity to cross-examine the authors of such letters, it is argued, these communications were hearsay and were not competent to establish guilt. Had these complaints been offered to prove Buy-Rite's failure to perform its obligations, this argument would have merit. But statements inadmissible to prove the truth of what they assert may be admitted if the fact of the assertion is in itself relevant irrespective of its truth. See 6 Wigmore, Evidence 1766 (1940 ed.).
 
 
 24
 In the early stages of the trial, the Government (over objection) adduced from Short, former executive director of the Greater Bennington Association, the fact that the Association had received complaints about Buy-Rite. Short said that he notified defendant Selmajane Stuchell and that she had answered that the correspondence was being taken care of by Buy-Rite. Hicks, Short's successor in office, also was allowed to testify that he had received inquiries and complaints pertaining to Buy-Rite. At least eighty per cent of this correspondence was called to Mrs. Stuchell's attention by way of some twenty weekly communications wherein Hicks had summarized the nature of the complaints and had given the pertinent data so that Buy-Rite might remedy the situation.[2] Hicks said that the majority of complaints claimed that goods had not been received after money had been sent and that membership fees were not returned within the thirty-day period as advertised. Postal Inspector McAvoy testified that he had undertaken an investigation of the affairs of Buy-Rite and that during a visit to the Bennington office, he observed Buy-Rite personnel separate a large number of complaints from the daily mail. These complaints, along with other correspondence, were forwarded to Lodi where it was processed by the two-man 'correspondence unit.' In answer to a preliminary question, he explained that his investigation was initiated because of the 'numerous complaints' concerning appellants' various enterprises that were received by the Post Office Department. A total of 3,400 communications had been received, he said, of which about one-half pertained to Buy-Rite. On cross-examination, McAvoy was asked if he sent copies of letters he received from customers to any officer of Buy-Rite. McAvoy replied in the negative, and on redirect, was asked why he had not done so. He gave three reasons. The first, his own conclusion, that 'the defendant corporation had shown a complete lack of good faith,' the court ordered stricken. In the second, he summarized a large number of complaints by persons 'who had specifically stated that they were not interested * * * in receiving a refund,' and added that 'they wanted the Post Office Department to conduct an investigation, so that other persons would not be victimized the way they had been.' For a third reason he stated that the Post Office Department is not permitted 'to act as a collection agency, or to adjust differences that might arise between patrons of the postal service.' None of the complaints discussed by Short, Hicks or McAvoy were introduced into evidence.
 
 
 25
 Of course, evidence that complaints had been received would not have been admissible to show that members had, in fact not received catalogs, merchandise or refunds. But evidence that there had been complaints which were called to appellants' attention was relevant on the issue of appellants' intent and good faith. The inference might readily be drawn that, since appellants knew that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which Buy-Rite conducted its affairs, continued operation despite this knowledge showed the existence of a scheme to defraud. See Reistroffer v. United States, 288 F.2d 379, 388 (8th Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959); cf., United States v. Kyle, supra, 257 F.2d at 564; Harrison v. United States, 200 F. 662, 674 (6th Cir. 1912). Viewed in light of the theory on which it was offered, therefore, this evidence was not hearsay, since it was not offered to show the truth of the charges in the complaints. See Frank v. United States, 220 F.2d 559, 563-564 (10th Cir. 1955); Buchanan v. United States, 233 F. 257, 259 (8th Cir. 1916); Wigmore, Evidence 1361, 1789 (3d ed. 1940); McCormick, Evidence 225 (1954). Although appellants were entitled to have the complaints offered, they did not object on that ground.
 
 
 26
 Buy-Rite's efforts to gain members did not cease with the December 1961 solicitation mailing. As late as April 1962 at least one magazine advertisement encouraged readers to send for information explaining Buy-Rite's advantages. And although the last volume solicitation mailing occurred in December 1961, Buy-Rite's responsibility for the representations therein continued in full force. Perhaps continued delays in filling orders or making refunds of payments and membership fees were not anticipated even though numerous complaints in this regard had been received. But certainly, Buy-Rite's personnel knew full well after December, when a great bulk of membership applications and orders poured in and were accepted, that the.$7.00 would not bring the right to buy 20,000 items in the 700-page catalog at factory cost. In accepting the membership fee, Buy-Rite reaffirmed the solicitation material's misleading representations to the contrary. There was some evidence that complaints received by Hicks after December 31, 1961, were grounded in the customers' misunderstanding of that portion of the solicitation material, just as much earlier other 'complaints' had caused Buy-Rite to compose and print 50,000 'disclaimer' letters. Finally, the indictment charged that part of the scheme to defraud was to ignore letters of inquiry and orders that had been placed.
 
 
 27
 Of course, the Government could not build its case merely upon evidence of complaints received after the last solicitation mailing. However, the important elements of the fraud were developed quite apart from this evidence. The original representations were proven to have been false by the 'Factory Buying Club' letter and the 'disclaimer' letters. The some 200 complaints received prior to the end of 1961 were sufficient to put defendants on notice that their representations were being so interpreted as to make them misrepresentations.
 
 
 28
 Furthermore, the trial court gave charges, requested by appellants, which specifically advised the jury that they were to resolve the question of appellants' good faith 'in the light of the circumstances as they appeared at the time that representations were made' and that if appellants believed that they could honestly carry out their promises 'You (the jury) should find the defendants not guilty despite the fact that some members may have lost money or had their refunds delayed.' To this the court added (as also requested) that 'The defendants cannot be held criminally responsible for every delay that occurred.'
 
 
 29
 Reference of witnesses to complaints that were not brought to appellants' attention stand on a different footing. That there were member complaints in substantial volume which were called to Buy-Rite's attention was disclosed early in the trial through witness Short and again by Hicks. Appellant Press admitted that inquiries and complaints were received in the normal course and under Fry's counsel's cross-examination McAvoy testified to a set procedure which Buy-Rite had established to cope with complaints. Many of the Buy-Rite members who testified referred to correspondence with Buy-Rite. Moreover, it was apparent that Buy-Rite knew that complaints were in many cases not sent to Buy-Rite in the first instance, and that it was not apprised of each and every one. In a letter to McAvoy, when his investigation had just begun, Buy-Rite's attorney explained: 'The arrangement that we presently have with many public and quasi-public organizations, in handling complaints which are received by the agency is that the complaints are forwarded either to this office or directly to the company involved, and the agency is given carbon copies of letters or other explanations of the way the particular complaint is being handled.' The letter goes on to suggest that McAvoy adopt a similar procedure for the Buy-Rite complaints he was receiving.
 
 
 30
 Because of the prominence of the complaints called to Buy-Rite's attention that were properly in evidence, the fact that there was mention of other complaints not specifically called to Buy-Rite's notice did not constitute error sufficiently prejudicial to demand reversal.
 
 
 31
 Under the exception concerning declaration of states of mind recognized in Sugden v. St. Leonards, L.R. 1, P.D. 154, 251 (1876), even such complaints were receivable to show the extent of dissatisfaction; although defendants could have insisted on production of the complaints, they did not do so-- doubtless wisely. While this had such small relevancy that it would better have been excluded, appellants countered with the contention that the complaints were a small portion of the total number of customers, and the trial court charged that 'the number of complaints, not the complaints themselves, unless they were brought to the attention of Buy-Rite, are only relevant as circumstantial evidence as to whether or not there was in fact a scheme or artifice to defraud.' True, the jury may not have understood this as limiting the use of unknown complaints to the exceedingly limited purpose we have indicated. But the number of complaints whose existence was not in some way brought to Buy-Rite's attention was so small in comparison to the number of which it was aware that any error could hardly have been prejudicial. Although the complaints received by the Post Office were not forwarded to Buy-Rite, the letter from Buy-Rite's attorney to McAvoy suggesting procedures for dealing with the flow of complaints addressed to the Post Office shows appellants' awareness of the existence of a large number, if not their precise number and nature.
 
 
 32
 Another problem is posed by McAvoy's explanation upon redirect examination of why he had not forwarded to Buy-Rite copies of the complaints the postal authorities had received. Since this line of questioning was opened on cross-examination, on redirect the Government was entitled to develop why McAvoy had not done so. Whether or not appellants were acting in good faith was the crucial finding of fact which was in the province of the jury; McAvoy's opinion was totally incompetent. Although his comment that some Buy-Rite members requested a Post Office investigation so that others would not be 'victimized the way they had been' may have been opened up by cross-examination, it would better have been stricken. However, when the testimony is considered in its setting we do not think the error was so grievous as to warrant reversing the convictions. The test is whether appellants' rights were substantially prejudiced. Fed.R.Crim.P. 52(a); Kotteakos v. United States,328 U.S. 750, 764-765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Cianchetti, 315 F.2d 584, 590 (2d Cir. 1963); United States v. Sansone,206 F.2d 86 (2d Cir. 1953).
 
 
 33
 One of the main considerations in deciding if substantial prejudice exists because of the introduction of hearsay material is the strength of the Government's case independent of the hearsay. See Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); United States v. Cianchetti, supra. Here, the evidence of guilt was overwhelming. This is certainly not a case where the McAvoy testimony can be considered as the factual straw that tipped the scales against appellants. To the contrary, his conclusory statements in the main reiterated the theory which the Government had urged and had supported with abundant evidence from the beginning of the trial.
 
 
 34
 Cases which have considered the impact of improperly prejudicial comments in the prosecutor's summation to the jury are closely analogous and provide some guideposts where, as here, the statements at issue come from a major Government witness. In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239-240, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1940), the Court affirmed a Sherman Act conviction despite the prosecutor's energetic appeal to class prejudice, stating:
 
 
 35
 'In the first place, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately. In the second place, this was not a weak case as was Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, where this Court held that prejudice to the accused was so highly probable as a result of the prosecutor's improper conduct 'that we are not justified in assuming its nonexistence.' * * * Of course, appeals to passion and prejudice may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial. But each case necessarily turns on its own facts. And where, as here, the record convinces us that these statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by passion and prejudice, reversal would not promote the ends of justice.'
 
 
 36
 In Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), the court described the prosecutor's remarks as being 'one, outside the record * * *; two, defamatory and derogatory of defendants and their counsel, and three, personal opinion and belief of guilt of the defendants.' In affirming the convictions, the court noted that 'the dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial,' and 'whether in light of all the facts and circumstances * * * the utterances * * * so influenced the jury as to bring about an unjust conviction.' 301 F.2d 736-737. Similar considerations controlled in United States v. Walker, 190 F.2d 481 (2d Cir.), cert. denied, 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653 (1951); United States v. Antonelli Fireworks Co., 155 F.2d 631, 638 (2d Cir.), cert. denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946); United States v. Brown, 79 F.2d 321, 324 (2d Cir. 1935).
 
 
 37
 An evaluation of the McAvoy testimony in the context in which it appears, especially when it is compared with the inflammatory comments which have failed to render other convictions defective, leads to the firm conviction that appellants have not been substantially prejudiced. McAvoy's over-zealous characterizations occurred as a fleeting incident in a trial involving more than fifty witnesses and well over a thousand exhibits. Practically a full calendar month was consumed by the trial, and the transcript extends to just under 2,000 pages. Furthermore, in light of other evidence, it could have come as no real surprise to the jury that Buy-Rite members thought they had been victimized or that their complaints resulted in a Post Office investigation. This conclusion is bolstered by the very nature of the facts that the jury was asked to determine: of critical importance was the illusive intent of appellants and not the existence of complaints or the reactions of Buy-Rite members. As in the Socony case, the statements were 'minor aberrations' that do not reflect the general tenor of the trial.
 
 
 38
 Complaints also figure prominently in appellants' claim that the prosecutor used unfair tactics to influence the jury. The government offered in evidence a large box filled with approximately 750 letters, purportedly sent to the Greater Bennington Association by discontented Buy-Rite members. These letters, Hicks noted, were the basis for his weekly communications to Mrs. Stuchell. Ruling on the objection to its admissibility was reserved pending examination of its contents by the court and defense counsel. Because cross-examination of Hicks was postponed, the carton was in plain view of the jury for a number of trial days. During Hicks' cross-examination, the Government withdrew its offer, whereupon the defense moved for a mistrial.
 
 
 39
 Apart from all else, a sufficient answer is that the carton's presence on the counsel table had not previously stirred defense counsel to seek corrective action. Nor have appellants shown the prosecutor's conduct in offering the contents of the box to be such that a mistrial should have been granted.
 
 Errors in the Charge
 
 40
 Appellants find reversible error in both the factual and legal phases of the instructions to the jury. Although an examination of the charge reveals some portions which plausibly may be questioned, reviewing the charge as a whole, we find the law to have been fairly and correctly stated and no error in the review of the evidence.
 
 
 41
 Appellants complain that the trial court unfairly emphasized the Government's case in its review of the evidence. They rely largely on the fact that twenty-three pages of the charge were devoted to the Government's case (including a resume of the counts in the indictment) while the defense was treated in but two and one-half pages. It should be apparent, however, that measurement of volume is of no real help in determining the propriety of the review of the evidence. See, e.g., United States v. Laurelli, 293 F.2d 830, 832-833 (3d Cir. 1961), cert. denied, 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962). Were the trial judge bound to lay out for the jury's benefit each nugget of proof and every explanation thought to be helpful in advancing the cause of each defendant, the advantages sought to be derived by the summation would be thoroughly frustrated. See United States v. Bentvena, 319 F.2d 916, 940 n. 14 (2d Cir.), cert. denied, Ormento v. U.S. (Di Pietro v. U.S., Fernandez v. U.S., Panico v. U.S., Galante v. U.S., Loicano v. U.S., Mancino v. U.S., Sciremammano v. U.S., Mirra v. U.S.), 375 U.S. 940, 84 S.Ct. 345, 346, 353, 355, 360, 11 L.Ed.2d 271, 272, rehearing denied Fernandez v. U.S.,375 U.S. 989, 84 S.Ct. 515, 11 L.Ed.2d 476 (1963). The test is one of fairness and thus quality and not quantity must be the governing consideration. The substantial imbalance here, for example, naturally resulted from the very nature of the proof: the Government had presented some fifty witnesses compared with the defendants' three. As is not uncommon, moreover, the time devoted to each side went primarily to a review of witnesses rather than of evidence. There has been no claim that the trial judge distorted or misconstrued the evidence, such that the jury could not pass fairly on appellants' factual position. The heart of the defense was their intent-- that their activities were carried out in good faith. Necessarily, that portion of the charge covering the law of the good faith defense supplemented the review of the evidence. We are not able to say that the summary of evidence was unfair and that it requires reversal.
 
 
 42
 The trial court declined to recite a number of principles of law in the charge as requested by appellants, which they deem prejudicial error. We have compared the omitted requests to charge urged on appeal with the instructions actually given and, with several exceptions which we treat elsewhere, find the legal substance of appellants' requests sufficiently covered. 'Even though a requested instruction be a correct statement of applicable law, its refusal does not constitute error if the issues in the case have been correctly and adequately covered in the general instructions given.' Bary v. United States, 248 F.2d 201, 214 (10th Cir. 1957), cert. denied,359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 635 (1959); see Agnew v. United States, 165 U.S. 36, 51, 17 S.Ct. 235, 41 L.Ed. 624 (1897).
 
 Local Prejudice
 
 43
 Appellants' claim that they stood trial in an atmosphere of local prejudice engendered by the prosecution and compounded by the court's failure to charge as requested rests in the main on one incident which occurred while appellant Press was on the stand. On cross-examination, Press' earlier assertion that Buy-Rite chose its Vermont address to profit from the Vermont fair trade situation was challenged. The Government's theory, documented by the references to Vermont in promotion literature, was that the Vermont location was a poorly disguised attempt to convey the impression of 'rural honesty' in furtherance of the fraudulent scheme. This line of inquiry was altogether proper.[3] When studied in context, the comments of the trial court appear clearly to have been made in a lighthearted, jocular vein. Evidently defense counsel added to the banter.[4] We are quite clear that this brief episode does not have the importance assigned by appellants. The comments alluded to in no way disparaged the defense or defense counsel, and did not evidence partiality towards either side. See United States v. Ross, 321 F.2d 61, 66 n. 3 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); Goldstein v. United States, 63 F.2d 609, 613 (8th Cir. 1933); cf. United States v. Persico, 305 F.2d 534, 540 (2d Cir. 1962); United States v. Ah Kee Eng, 241 F.2d 157, 161, 62 A.L.R.2d 159 (2d Cir. 1957).
 
 
 44
 Since the dialogue was in itself innocuous, we do not find reversible error in the refusal to charge as requested that the 'verdict should be one based on the facts and not on bias or prejudice or revenge or sympathy and the fact that the defendants or some of them are not residents of the State of Vermont, must play no part in your deliberations.' We are constrained to comment, however, that it is indeed difficult to fathom why such a request was refused.
 
 Use of the Indictment at Trial
 
 45
 The trial court read the indictment to the jury on three separate occasions: before the jury was impaneled, after the jury was sworn and in the course of the charge. Appellants contend that such repetition erroneously overemphasized the Government's case against them and that reversible error resulted when the jury was given the indictment to take to the jury room.
 
 
 46
 It is not improper for the court to read the indictment in its entirety or portions thereof to the jury. See United States v. Martin, 223 F.2d 666, 667 (2d Cir. 1955). Indeed, in protracted cases involving numerous counts such as this one, reference to the indictment often serves as a helpful guide in delineating the issues the jury may be called on to decide. Similarly, it is not error to give the indictment to the jury for use during its deliberations. See Twitchell v. United States, 313 F.2d 425, 431 (9th Cir. 1963), cert. denied Rogers v. United States, 376 U.S. 916, 84 S.Ct. 670, 11 L.Ed.2d 612 (1964); Shayne v. United States, 255 F.2d 739, 743 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 39, 3 L.Ed.2d 64 (1958); Garner v. United States, 244 F.2d 575 (6th Cir.), cert. denied, 355 U.S. 832, 78 S.Ct. 47, 2 L.Ed.2d 44 (1957). The decision to do so rests in the sound discretion of the court. Shayne v. United States, supra; C.I.T. Corp. v. United States, 150 F.2d 85, 91 (9th Cir. 1945). Nevertheless, courts justifiably have been concerned that overemphasis of the indictment may lead the jury to construe the indictment as evidence of guilt of the accused. Therefore, the limiting instructions of the trial court are of particular importance. See Garner v. United States, supra; United States v. Schanerman, 150 F.2d 941, 945 (3d Cir. 1945).
 
 
 47
 Examination of the record in the instant case reveals that whenever the trial court read from the indictment, thorough cautionary instructions were given. Before reading the indictment to the veniremen, the court said:
 
 
 48
 'Now the mere fact that there has been an indictment handed down by a Grand Jury is no evidence at all, in any way, of any guilt, on the part of any of the named defendants. It is just a part of the mechanics, set up by the United States Government, for bringing people to trial for alleged offenses. The mere fact that there has been an indictment isn't any evidence of guilt of any kind.'
 
 
 49
 When the jury had been impaneled abbreviated comments to the same effect were repeated. Finally, at the very outset of the charge, the court elaborated on the function of the Grand Jury and reiterated that 'the indictment is no evidence of guilt.' The use of the indictment here was in all respects proper and appellants' rights were in no way jeopardized.
 
 Withdrawal of Fry's Counsel
 
 50
 Appellant Fry contends that he did not have a fair trial because co-defendants with possible adverse interests were represented at trial by the attorney who had represented Fry upon arraignment (July 24, 1962). On December 17, 1962 this attorney moved ex parte to withdraw as counsel for Selmajane and William Stuchell and appellant Fry since he was 'of the opinion that some of the defendants, because of their positions towards the charges and towards each other, should have separate counsel.' The motion was granted December 17, 1962, well in advance of trial, by an order which stated 'that there is a real possibility of a conflict of interest' and directed the attorney to notify those defendants of his withdrawal. The trial court's decision on the motion to withdraw properly applied the principles recognized in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Fry suggests obliquely that he did not testify in his own behalf because of the prospect of cross-examination by former counsel then representing adverse interests. However, he makes no complaint of the caliber of his representation, which was by counsel of his own choice. No objection was made to the attorney's withdrawal either before or during trial. Furthermore, the defenses of Press and Fry, namely, good faith and honest intentions, were complementary.
 
 
 51
 Appellant's transparent attempt to profit by the unsolicited precautions taken on his behalf by the trial court and his original counsel, in which he acquiesced, is without merit. His claim of reversible error falls well short of the mark of showing that he was not given a fair trial.
 
 
 52
 Judgments affirmed.
 
 
 53
 DIMOCK, District Judge (dissenting).
 
 
 54
 Defendants were convicted on 24 counts charging violation of Section 1341 of Title 18 U.S.Code, the well known mail fraud statute, and on one count of conspiracy to violate it. Simply stated, the crime consists of the use of the mails in the course of a scheme to defraud. Essential to the establishment of the existence of a scheme is proof of the making of false representations of material facts and second, a state of mind of the maker at the time the representations were made consisting either of knowledge that the representations were false or a reckless disregard for their truth or falsity. With the addition of evidence of an agreement, the same proof would suffice for the conspiracy charge.
 
 
 55
 There was no dispute as to the alleged use of mails consisting of the receipt of 24 pieces. These contained checks sent by 24 customers of defendant's mail order business.
 
 
 56
 The alleged representations, insofar as they were of substance, were: first, that, upon the payment of $7, defendants would furnish, among other items, a catalog of some 700 pages and that some 20,000 items could be purchased therefrom at 'factory' prices and, second, that delivery of goods ordered and refunds to customers who chose to rescind their 'memberships' would be made promptly. These statements were, of course, promissory in nature so that, standing alone, they did not qualify as statements of fact. To substantiate a charge of fraud it was necessary to imply a statement that defendants intended to carry out the promises and then prove that defendants did not in fact so intend.
 
 
 57
 With respect to the first, it was shown that, only upon payment of an added $13.75, could the 700 page catalog and the right to purchase the added 20,000 items be obtained. Defendants maintained that their promissory representations were not to the contrary.
 
 
 58
 With respect to the representation of prompt service, the prosecution offered evidence that, in a number of cases, merchandise or refunds arrived belatedly if at all. Defendants contended that poor service was merely the result of an unanticipated flood of customers. The issue, therefore, was whether defendants, at the time when the promise of good service was made, had known that such would not be forthcoming or perhaps had not even intended that it should be.
 
 
 59
 To prove the second element both of the alleged substantive crimes and of the conspiracy, i.e. that this state of mind had existed, the prosecution introduced a mass of evidence pertaining to over four thousand so-called 'complaints.' I shall continue to refer to such items by the word which has been universally, though to my mind unjustifiably, applied to them during the trial and in the majority opinion.
 
 
 60
 The complainers were not produced. A postal inspector and two representatives of a chamber of commerce testified to complaints that had been received and a box full of complaints was offered and, when objected to as hearsay, left on the counsel table all during the trial pending a final withdrawal of the offer.
 
 
 61
 The only evidence as to the contents of these complaints as to which the postal inspector and the representatives of the chamber of commerce testified was that they contained statements that deliveries and refunds to the writers had not yet been received. I find no evidence that any of them were grounded upon misunderstanding of the promotion material's statements as to the 20,000 factory cost items.
 
 
 62
 Defendant Buy-Rite had 50,000 members. Up to December 31, 1961, complaints, presumably all dealing with non-receipt of deliveries or refunds, and numbering not more than 200, had been called to defendants' attention by the chamber of commerce which had received them over the nine month period beginning in April 1961. Defendants did not thereafter send out any more of the material containing the representations complained of. There is no evidence that any advertisements published later reiterated these representations.
 
 
 63
 In spite of the cessation of mailings at the end of 1961, a chamber of commerce executive was permitted to testify to his subsequent sending of complaints to the defendants. During the charge the trial court read to the jury a list recounting the weekly totals of communicated complaints totaling, for the period between February 27, 1962 and June 23, 1962, some 225. A postal inspector testified that he saw 242 complaints at defendants' office in Bennington, Vermont, on January 12, 1962 and 251 at defendants' office in Lodi, New Jersey, on January 30, 1962. He testified that 1600 complaints had been received by the Post Office Department relative to defendant Buy-Rite and 1600 in relation to its affiliate, defendant Factory Supply Company. He did not furnish these 3200 items to the defendants or, so far as the record discloses, notify defendants of their contents, or even their existence. The foregoing applies with equal force to 625 complaints which the chamber of commerce executive said that he had received over and above the 225 referred to in the charge.
 
 
 64
 Thus, of the 4000 odd complaints testified to, not more than 200 were called to defendants' attention before they stopped making representations, some 700 more were called to their attention thereafter and the remainder, the overwhelming majority, were never called to their attention.
 
 
 65
 As evidence of the truth of their contents, these complaints were all clearly hearsay. The majority opinion says, however, that the inference might be drawn that continued operation despite knowledge of complaints showed the existence of a scheme to defraud.
 
 
 66
 This may possibly be true with respect to the 200 complaints received by the chamber of commerce over a 30 to 40 week period and called to the defendants' attention from time to time during the period of mailing of promotional material. It may be that notice to defendants, from whatever source and however unreliable, that there were delays in their operations, coupled with subsequent repetition of a promise that operations would be prompt, would be admissible to suggest the existence of a reckless state of mind in the defendants at the time of the repetition of the promise. It may also be that there is a permissible inference that this reckless state of mind not only persisted into the indefinite future but existed in the indefinite past so as to meet the requirement of scienter or recklessness at the time of the earlier making of the representations. The whole of this rather flimsy structure is founded, however, on the fact that the defendants reiterated the representations after notice that they had not been acting promptly. This theory, of course, would justify the admission of only the less than 200 complaints brought to defendants' attention in 1961 before the last reiteration of the representations.[1]
 
 
 67
 There is not even this basis for the admission of evidence of notice, given to defendants in 1962 after their last reiteration of the representations, by the receipt of 242 complaints in defendants' office in Bennington, 251 complaints in Lodi and 225 complaints received by the chamber of commerce executive and sent to defendants.
 
 
 68
 The majority, however, hold that, in accepting membership fees after December 31, 1961, defendants reaffirmed what are referred to as the solicitation material's misleading representations that.$7.00 would bring the right to buy 20,000 items at factory cost. This theory necessarily proceeds upon the assumption that defendants were under a duty not to accept the membership fees. Such a duty could only arise if defendants had notice that the applicants had been misled. Though one of the defendants admitted that 'some of the people who were reading the literature, didn't fully understand, or weren't reading all of the literature and were writing in and asking when they would receive the 700 page catalogue, so they could buy the 20,000 items at factory cost,' nothing had occurred which would oblige defendants to presume that every recipient of the promotional material had been misled into thinking that the 'introduction' to the Factory Buying Plan would permit the recipient to take advantage of it without further cost. The promotional material was at worst only equivocal on that point. The fact that a representation is capable of misleading is not enough. The recipient must be misled. The sending in of.$7.00 membership fees by prospects was not evidence to defendants that the senders had been misled. The admission of evidence of the approximately 700 complaints of which defendants received notice after the cessation of mailings of promotional material was therefore erroneous.
 
 
 69
 Neither the court below nor the majority of this court have stopped at approving the admission of evidence of complaints brought to the attention of defendants. Evidence of 3825 complaints of which defendants never heard was admitted below, and its admission was specifically submitted to the jury by the charge and the substance of the charge submitting it approved by the majority.
 
 
 70
 At this point the majority opinion no longer ostensibly applies settled principles of law to the facts of the particular case but creates a new principle. The court holds that, in a fraud case, evidence of the extent of dissatisfaction of third persons, not proved to have been defrauded, is admissible. The Government concedes that the issue appears to be one of first impression. The courts went far in holding that, in a fraud case, evidence of other frauds committed by the defendant was admissible. I think that the majority go too far in opening the door still farther and admitting evidence of mere dissatisfaction of others with whom the defendant has done business.
 
 
 71
 It is a rare large business organization which, no matter how high its ethics, does not find it necessary to maintain a complaint department to deal with dissatisfied customers. No one would claim that the existence of a dissatisfied customer whose dissatisfaction was not based on fraud would have any logical bearing on the question whether a defendant had been guilty of fraud in another case. Yet the rule of the majority opinion admits, as proof of fraud, evidence of dissatisfaction without any proof that the dissatisfied customer was defrauded.
 
 
 72
 My brethren have introduced a new darling to the prosecutor.
 
 
 73
 The errors in the admission of evidence of complaints and of dissatisfaction and the error in the charge cannot be disregarded as not of critical importance. The inadmissible evidence of complaints and dissatisfaction may well have been the deciding factor. What was presented was a picture of a rather shabby concern which employed such devices as false names, a.$7.00 fee that entitled the customer to pay $13.75 more for more discount privileges, a country address for a metropolitan enterprise, and a special reference to Dun and Bradstreet-- not admirable devices but arguably within the morals of the market place. The Government's burden was to demonstrate, in addition, a fraudulent intent. The jury could well have said, 'The comparatively few instances where the prosecution presented dissatisfied customers as witnesses may all have been the result of innocent mistakes or carelessness or chance but when they add thousands more we have to rule out mistakes and carelessness and chance; the defendants must have intended to defraud people.'
 
 
 74
 The judgments of conviction appealed from should be reversed and a new trial ordered.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 Postal Inspector McAvoy testified that the Buy-Rite soliciation material was mailed in the following sequence:
 March, 1961 25,000
 June, 1961 100,000
 July, 1961 500,000
 August-September, 1961 1,000,000
 October-November, 1961 1,000,000
 December, 1961 1,000,000
 In July, 1961 and again in September, 1961, 25,000 copies of the 'disclaimer' letter were printed.
 
 
 [2]
 These weekly summaries were received in evidence
 
 
 [3]
 This category includes those complaints (twenty per cent) that Hicks did not call to Buy-Rite's attention; those that Hicks said were still being received at the time of trial at the rate of four per day; and, those that were sent directly to Postal authorities
 
 
 [4]
 It follows that the Government's comments in summation going to this issue were within the confines of permissible argument, which includes the right to argue inferences based on the record. See United States v. De Fillo, 275 F.2d 835, 840 (2d Cir. 1958). It is not apparent how New Jersey citizens could be unduly prejudiced when the Government's summation urges the jury to protect 'American citizens like ourselves from such schemes.'
 
 
 [5]
 Appellants argue that the prejudicial impact of this incident is conclusively demonstrated by the verdict of not guilty as to the two Vermont residents, Selmajane and William Stuchell. This overlooks the testimony of Press which placed both Stuchells in purely ministerial capacities. Apparently neither joined in managerial decisions or responsibility
 
 
 [1]
 An advertisement published in April 1962 did not embody a reiteration of the representations