UNITED STATES of America,
Appellee,

v.

AH KEE ENG, Defendant-Appellant,
and

Noh Kan Lee and Sing Fu Chen,
Defendants.

No. 34, Docket 23728.

United States Court of Appeals
Second Circuit.

Argued Dec. 4, 1956.

Decided Feb. 20, 1957.

Jac M. Wolff, New York City, for defendant-appellant.

Leonard P. Moore, U. S. Atty., E. D New York, Brooklyn, N. Y. (William H. Sperling and Marie L. McCann, Asst. U. S. Attys., Brooklyn, N. Y., of counsel on the brief), for appellee.

Before CLARK, Chief Judge, and FRANK * and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

As the proof at the trial was insufficient to support Ah Kee Eng's conviction for conspiring with Noh Kan Lee and Sing Fu Chen to import and sell heroin in violation of 21 U.S.C.A. § 174, and because of the improper admission of evidence, and prejudicial error in the conduct of the trial judge, we must reverse the conviction.

Section 174 of Title 21 U.S.C.A. makes it unlawful to conspire to commit any of the acts set forth in the first part of the section which punishes anyone who "fraudulently or knowingly imports or brings any narcotic drug into the United States * * *, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation,

---

* Judge Frank died after voting for reversal, but before expressing his views with respect to this opinion.

concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law * * *."

Here Eng was on trial for conspiracy with Chen and Lee to import and sell heroin "knowing the same to have been imported contrary to law." Chen and Lee had both pleaded guilty prior to trial and the government called them as the principal witnesses against Eng.

■ The only admissible evidence introduced by the government to show that Eng knew of the Chen and Lee conspiracy to import and sell heroin was this: On November 17, 1954 Chen and Lee, who served as officers' mess boy and cabin boy respectively on the Norwegian steamer Bronxville, left the vessel which had docked at Pier 19 Staten Island and went to find Eng at 108 Eldredge Street in Manhattan. They left behind on the Bronxville five packages of heroin (also referred to as opium powder) which they had purchased for $350 in Bangkok in September and which they hid on the ship.

Failing to find Eng on their first attempt, Chen and Lee finally met him in his apartment at the Eldredge Street address at 8:30 P.M. This was the first time Chen and Lee had ever met Eng. As Chen did not understand the Cantonese dialect and Lee did, it was Lee who spoke to Eng. Lee and Eng retired to a bedroom where they talked privately. Lee asked Eng whether he wanted "opium powder." Eng said yes, he was going to buy and he asked Lee how many packages he had. Lee said five. Whereupon Eng said he was going to give them a thousand dollars. Nothing else happened according to Lee. They were in the apartment about fifteen minutes and Lee's talk with Eng took five minutes. Chen and Lee then left.

Chen and Lee were arrested the next day after leaving the Bronxville and five packages of heroin were found on them. Later that day customs agent Wong talked to Eng on the telephone at about midnight. Speaking to Eng in Cantonese, Wong said he was Lee, that he had the goods and asked Eng if he had the money. To this Eng made no reply. Wong then asked where he could see Eng and Eng suggested that Wong (whom he supposed to be Lee) get a cab and come to his home. Wong said he had to get back to the ship that was sailing in the morning, whereupon Eng said to meet him in front of the Silver Star Theatre in Chatham Square in ten or fifteen minutes. After Chen and Lee had waited in a taxi in front of the theatre, Wong called again. Eng said that Chen and Lee should leave the taxi and meet him on the opposite side of the theatre. Eng finally appeared at 1:15 A.M. and crossed the street toward Lee and asked him why he should stand on the street. Before Eng reached Lee customs agent Cozzi came from behind and seized Eng. It is from this proof that we must find enough evidence of Eng's involvement in a conspiracy to import and sell heroin to justify submitting the case to the jury.

There was no evidence from which the jury could find that Eng conspired with Chen and Lee to import and sell narcotics. There was no evidence from which it could be inferred that Eng knew the heroin had been imported, or that Lee and Chen were to bring heroin into the country. The proof shows at most a talk between Lee and Eng about Eng's willingness to purchase five packages of heroin for a thousand dollars. Neither Lee nor Chen ever told Eng where and how they had received the heroin or even who suggested that they should seek out Eng. Wong's remarks, whilst pretending to be Lee, that he had to get back to the ship which was sailing in the morning, to which remarks Eng made no response, certainly do not supply the necessary evidence from which it may be inferred that Eng knew of a conspiracy to import narcotics as it does not appear from the testimony of Lee that there had been any mention of a ship during his talk with Eng on November 17.

There was no agreement to advance any joint interest or for Eng to do anything more than pay money upon receipt

of the heroin. The evidence had to do with an isolated transaction, a purchase of five packages for a thousand dollars. The facts are somewhat similar to those disclosed in United States v. Koch, 2 Cir., 1940, 113 F.2d 982. There we held that even where a single purchase had actually been made that, without more, was insufficient evidence to connect the purchaser with the conspiracy to import and sell drugs in violation of law. See cases cited in United States v. Koch, and also United States v. Di Re, 159 F.2d 818, 2 Cir., 1947, affirmed, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. Had Eng received the heroin and paid the money he would have been guilty of illegal possession and illegal purchase of heroin. The premature action of the customs agents apparently prevented Eng from going through with the transaction which he had discussed with Lee. In any event, what might have resulted in a simple case of purchase and possession, had the purchase been consummated, cannot be tortured into a conspiracy to import and sell because evidence of a substantive crime is lacking.

In view of the failure of proof, the motion for a directed verdict of acquittal made at the end of the government's case and again at the conclusion of all the testimony should have been granted.

█ Having failed to adduce any evidence of Eng's knowledge of the conspiracy and willingness to join such a conspiracy, all the other evidence was improperly admitted. Over objection of defense counsel the court should not have admitted the evidence regarding talks with one Wong Ah Que in Bangkok or Honk Kong about Eng, and talks between Chen and Lee about delivery of the heroin the next day and Chen's testimony of what Lee had told him of Lee's talk with Eng. Thus Chen testified that when he told his friend Wong Ah Que in Bangkok that he was going to America to do some business, not mentioning what the business was, Wong Ah Que told him he had a friend in America and gave him Eng's name and address. The error in admitting this evidence, over objection, was further aggravated, in our opinion, to the point of prejudice, as the government attempted to show, when Chen failed to give further details, that when questioned *after his arrest* Chen had said that he had talked to Wong Ah Que about heroin and Wong Ah Que had said to him " * * * your ship going Bangkok, you can buy. I can introduce you, I got friend, maybe you go see him." And further along, Chen was permitted to testify, despite repeated objections, that Lee told him after Lee's talk with Eng that Eng had said whatever they brought to this country he (Eng) was going to buy. As Lee himself did not testify that Eng had ever said this to him, it was error to admit such hearsay testimony as it was not in furtherance of any conspiracy to which Eng was shown to have been connected, or with which any subsequent evidence connected him.

Of course each conspiracy trial has its problems regarding the order in which evidence is to be received. Thus the device of receiving evidence "subject to connection" is frequently resorted to. But in this simple case there was no need to admit the testimony of Chen about what Lee told him of Lee's talk with Eng when this testimony was offered. Lee could have testified first as it was he who talked with Eng. Had he testified that Eng said to him that he would buy whatever they brought in, then it would have been proper to permit Chen to relate that Lee had told him this.

█ Reversible error was also committed when the court permitted the jury to hear, despite repeated objections, the testimony of three customs agents regarding statements made to them by Chen and Lee after their arrest on November 18. The conspiracy having ended with the arrest of Chen and Lee what they thereafter said could not possibly be in furtherance of the conspiracy. Their out-of-court unsworn statements were hearsay declarations and their improper admission would require reversal of the conviction. Krulewitch v. United States, 1949, 336 U.S. 440, 442–443, 69

S.Ct. 716, 93 L.Ed. 790; Lutwak v. United States, 1953, 344 U.S. 604, 617–618, 619, 73 S.Ct. 481, 97 L.Ed. 593.

The government argues, however, that the reception of these post-arrest statements could not have been harmful as they were merely cumulative, and, in any event, the court finally struck the evidence and told the jury to disregard it. We cannot agree that the evidence was merely cumulative or that the error was rendered harmless by the court's instruction to the jury.

The testimony of the customs agents concerning these post-arrest statements added certain details which Chen and Lee had not supplied during their testimony. Thus agent Cozzi testified that Chen told him that Eng was the man recommended to him (Chen) by a friend from Hong Kong [1] as one with whom he (Chen) could do business if he came to the United States. Cozzi further quoted Chen as saying that Lee had advised him (Chen) of Eng's offer to buy and he (Chen) agreed with Lee that they would deliver the opium powders to Eng the following day. Thus the testimony regarding the post-arrest statements was more than cumulative as it added additional details which were not unimportant.

These post-arrest statements were before the jury during most of the trial which commenced February 23 and concluded six days later on March 1. They were referred to in the summation of government counsel. Finally in his charge to the jury the judge struck the evidence by saying:

" * * * there was received in evidence, over the defendants' objection, statements of what Lee and Chen said to the customs agents. Those conversations were objected to as not having been in the presence of the defendant. If I had it to do over again I wouldn't admit those conversations for this reason, because by that time, on the 18th, Lee and Chen having been apprehended, and the opium having been taken from them, the conspiracy necessarily failed. It could no longer be carried into effect. Therefore, anything which Lee and Chen said to the officers after that time would not be binding on this defendant on the theory that the partnership having failed in its efforts, the capacity of Lee and Chen to bind the defendant by anything that they might say to the agents had expired. I am therefore striking so much of that testimony either as given by Lee or Chen, or as given by any of the agents themselves, and I am instructing you to disregard it. I will say, parenthetically, that it is a purely technical ruling and I think it will not in any wise interfere with your ability to reach a verdict by considering the competent evidence in the case."

Proper exception was taken to this charge.

In the circumstances of this case the belated striking of this highly prejudicial and inadmissible evidence was not sufficient to cure the error. In United States v. Sansone, 2 Cir., 1953, 206 F.2d 86, 88, which also involved a conviction for conspiracy to import and sell narcotics, we reversed a conviction where statements not in furtherance of the conspiracy, and therefore hearsay, were improperly admitted and seven days later were excluded by the trial judge. We pointed out, at page 88, that "When it cannot with reasonable certainty be shown that the harm has been undone a reversal is required." In this case it is impossible to say that the jury could have eradicated the impressions which these post-arrest statements must have made or that they could sift out and remember what Chen and Lee had testified to as distinct from the additional fea-

---

1. It is not clear from the evidence whether Chen had two different friends in Bangkok and Hong Kong, whether he spoke with the same friend in those two places (which seems unlikely), or whether either Chen, or Cozzi in reporting Chen, erred in mentioning two different places.

tures supplied by the agents' account of their post-arrest statements.

Nor was the judge's comment on his belated instructions to disregard this evidence of any benefit to the defendant; quite the contrary. By calling his action "purely technical" and by adding that he did not think it would in any wise interfere with their "ability to reach a verdict" the judge as much as said that they should have no trouble convicting the defendant. Any doubt we may have as to the probable effect of the judge's comment is dispelled by the judge's attitude toward the defense and defense counsel throughout the trial.

There is a third ground of error which also requires reversal, namely the prejudicial nature of the trial judge's treatment of defense counsel and the defense throughout the trial. Thus at numerous pages of the printed appendix the judge exhibited an attitude of impatience, and an annoyance at proper objections and interruptions as if they were captious, absurd or unnecessary. And occasionally the judge made gratuitous comments disparaging the defense counsel and the defense. See particularly pages 14, 18, 31, 37, 45, 47, 53, 67, 71, 78, 79, 89, 106, 116, 122, 124, 126, 134, 137, 140, 148, 155, 162, 192, 242, 266 and 267.

While an appellate court should be loath to read too much into the cold black and white of a printed record, it cannot disregard numerous remarks from the bench of a nature to belittle and humiliate counsel in the eyes of the jury. Especially is this so where many of counsel's objections must be repeated in order properly to protect his client because he believes in good faith that the judge has ruled erroneously.

While the trial judge should be permitted considerable attitude in dealing with counsel, ruling on objections, and keeping the trial moving, he must not forget that the jury hangs on his every word and is most attentive to any indication of his view of the proceedings. Thus repeated indications of impatience and displeasure of such nature to indicate that the judge thinks little of counsel's

intelligence and what he is doing are most damaging to a fair presentation of the defense. A less experienced advocate might well have trimmed his sails to such a judicial wind as prevailed in the courtroom during this trial, and thus have jeopardized the rights and the proper interests of a defendant on trial for a serious felony. Fortunately for this defendant his counsel continued to object when he thought he should and, as we have shown, events proved the wisdom and propriety of his course. Here the court overstepped the proper bounds and, by what was said and implied before the jury, seriously prejudiced the defendant's case in the eyes of the jury.

In view of our conclusion that there must be a reversal of the judgment for each of the three errors which we have considered, we believe it unnecessary to discuss the many other errors complained of.

Judgment reversed; the case is remanded for further proceedings consistent with the foregoing opinion.