**UNITED STATES of America, Plaintiff-Appellee,**
v.
**Abraham W. BOLDEN, Defendant-Appellant.**

**No. 14907.**

United States Court of Appeals Seventh Circuit.

Dec. 29, 1965.

Rehearing Denied Feb. 25, 1966. En Banc.

454

Raymond J. Smith, James F. Ward, Chicago, Ill., for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crow-

ley, Richard T. Sikes, Asst. U. S. Attys., Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and KNOCH and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Defendant Abraham W. Bolden, a former Secret Service agent for the Treasury Department, appeals from a judgment of conviction on all counts of an indictment charging him with seeking a bribe in return for acting in violation of his official duty, 18 U.S.C. § 201, corruptly obstructing the due administration of justice, 18 U.S.C. § 1503, and conspiring with Frank Jones to commit the crimes defined in these sections, 18 U.S.C. § 371.[1] A sentence of six years was imposed. Defendant also appeals from the denial of a motion for a new trial based upon newly discovered evidence.[2]

The evidence, as developed at the trial and considered in the light most favorable to the Government, tends to establish the following circumstances.

On April 26, 1964, Agent John E. Russell of the Secret Service office in Chicago prepared an original and seven copies of a report relating to the investigation of a counterfeit savings bond case involving, among others, one Joseph Spagnoli. The copies were distributed to agents in the Chicago office, including the defendant Abraham Bolden. On May 8, Agent Conrad Cross received from the defendant the copy of the report which had been designated for the defendant and him. Cross thereafter left his office for a short time; when he returned the report was gone.

On May 9, following the return of a grand jury indictment, arrests of Spagnoli and others who had been included in the counterfeiting investigation were made. After his arrest and while in the Secret Service office, Spagnoli

---

1. The verdict of guilty was returned by a jury after a second trial. A mistrial had been declared in an earlier trial because of the failure of the jury to agree.

2. The appeals were consolidated by an order of this court.

spoke to Agent Bolden. He asked if Secret Service agents took money. The defendant replied that out of fourteen thousand agents, some did.

On the morning of May 11, the defendant went to the home of Frank Jones. Jones was then under indictment for counterfeiting and had twice been arrested by the defendant. Agent Bolden told Jones a number of facts about the Spagnoli case, including the whereabouts of Sandra Hafford. Hafford, an erstwhile friend of Spagnoli, had testified against him before the grand jury, and was being held in protective custody by the Secret Service in a downtown Chicago hotel. The defendant produced several onionskin papers stapled together and a small, typewritten piece of paper containing an excerpt from the summary report of the Spagnoli investigation. He asked Jones to go to Spagnoli's home, give Spagnoli the piece of paper, and tell him that he could have the entire file for $50,000. The defendant said that the money would be split between Jones and him.

Jones visited Spagnoli's home the following day and delivered the piece of paper. He told Spagnoli that he had a contact in the Secret Service and that the Spagnoli file was available for $50,000. Jones returned home and called the defendant. Soon thereafter Bolden picked Jones up in his official car. The defendant instructed Jones to inform Spagnoli that the Secret Service had arranged to have Sandra Hafford's hair dyed red that afternoon. The defendant also suggested that Spagnoli be cautioned not to curse when talking to Hafford on the phone because the conversation would be taped.

On the morning of May 13, Spagnoli called Maurice G. Martineau, the Secret Service agent in charge, and related Jones' offer to him. The fact of Spagnoli's call was in turn repeated within earshot of the defendant. Later that day the defendant called Jones, told him that Spagnoli had called the "boss," and instructed him not to talk to Spagnoli.

Subsequently, Spagnoli gave Martineau the paper he received from Jones and identified Jones as the person who had approached him. Jones was arrested on May 18. In the meantime, Agent Russell retrieved all copies of the Spagnoli summary report with the exception of the one designated for Agent Cross and the defendant.

The defendant left for Washington, D.C. on May 17 to attend a Secret Service training school. In the afternoon of the following day, in the company of three agents, he was returned to Chicago under pretext and taken to the United States Attorney's office. There Agent Martineau began to explain the situation. At one point the defendant interrupted him to observe that the Secret Service was free to check his typewriter. Martineau had not mentioned the typewritten nature of the excerpt from the Spagnoli file. Later, in response to a question by Agent Jordan, the defendant said he didn't know that the Secret Service was going to dye Hafford's hair. Then, within a few minutes, he volunteered that he didn't know they were going to dye her hair "red."

The defendant was formally placed under arrest late in the evening of May 18. A few days later he told a Secret Service informant, Richard Walter, that he would give $500 to the man who would kill Jones, the "stool pigeon."

The defendant's motion for a new trial based upon newly discovered evidence relates to certain events surrounding the counterfeiting trial of Government witness Spagnoli in January, 1965, some five months after the defendant's trial and sentencing.

At his own trial, Spagnoli testified that he had committed perjury in certain respects as a Government witness in the defendant's trial. He testified that his livelihood was gambling and that he had falsely testified during the defendant's trial that his mother supported him. He stated that this perjury was suborned by Government counsel in order to make him look better in the eyes of the jury. Spagnoli also testified that he had lied

during the defendant's trial in reference to the date on which his call to Agent Martineau was placed, and possibly with reference to other dates. Spagnoli was thereafter found guilty and received a fifteen year sentence.

The defendant's motion for new trial also included the affidavit of his trial counsel. The affidavit stated that counsel had a conversation with Spagnoli following the latter's conviction in which Spagnoli complained that an assistant United States Attorney had "backed down from a deal" with him concerning his testimony against the defendant. During the defendant's trial, Spagnoli had testified that he had received no promise of leniency from the Government in exchange for his testimony.

The district judge, who presided at the trials of both Spagnoli and the defendant, entered findings of fact and conclusions of law with respect to the defendant's newly discovered evidence and denied the motion for a new trial.

## I.

The defendant's first contention is that he was deprived of a fair trial by the prejudiced attitude of the trial judge, by certain prejudicial rulings, and by the misconduct of the prosecuting attorney. More specifically, the defendant points to a number of circumstances which, by reason of the district judge's allegedly preconceived opinion of the defendant's guilt, resulted in the unconscious oppression of defense counsel's best efforts, and which also purportedly demonstrate the excessive zeal of Government counsel. We have examined each of the defendant's charges in detail, but will discuss only a few of the more serious allegations.

After the jury had reached a deadlock in the defendant's first trial, the jury was returned to the courtroom and the so-called "Allen charge" [3] was given by the trial judge. The judge added that in his opinion the evidence would sustain a verdict of guilty on all three counts of the indictment, but clearly informed the jury that his opinion could be entirely disregarded. The jury remained deadlocked and a mistrial was declared.

■ Prior to the second trial, defense counsel moved for a substitution of judges on the ground of prejudice. The motion was denied. The defendant says that the motion should have been granted, that since the judge had expressed an opinion of guilt, an impartial trial before the same judge was impossible. The defendant, significantly, cites no authority for his proposition. Nor do we find any merit in it.

■ A federal judge may, in his discretion, comment upon the evidence or, in exceptional cases, express an opinion of the guilt of the accused. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933); United States v. Gibas, 300 F.2d 836 (7th Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 32, 9 L.Ed. 2d 58 (1962). We do not see how the exercise of that discretion in one trial, without more, could necessarily result in prejudice against an accused in a second trial. An opinion as to what the evidence has demonstrated cannot be equated with personal bias. Trial judges are invariably called upon to conduct impartial trials despite whatever opinion they may have or which they may formulate during the course of the trial concerning the guilt or innocence of an accused. Such impartiality is precisely what is expected of them, and an experienced trial judge must be assumed capable of performing his essential function. In short, prejudice must be shown by trial conduct; it may not be presumed or inferred from the subjective views of the judge.

■ The defendant next contends that the record substantiates his view of the existence of preconceived judicial prejudice. He states that his trial counsel frequently failed to object to improper evidentiary procedures because of a timidity occasioned by the "criticism, belittling,

3. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1892).

condemnation and admonitions" of the trial judge. As an illustration, the defendant refers to a warning issued by the judge to defense counsel in connection with the cross-examination of Government witness Frank Jones. The court's admonition was prompted, *inter alia*, by an attempt on the part of defense counsel to impeach the witness from memory, without referring to the transcript of the defendant's first trial. The court interrupted, stating: "Counsel is admonished not to follow that procedure any more. When you wish to ask an impeaching question, go back to the record and ask him correctly." The jury was then excused, the warning was repeated, and the judge suggested the possibility of stronger measures if the offending practice were continued. We find no error. The improper method of questioning by defense counsel justified the reprimand. Moore v. United States, 132 F.2d 47 (5th Cir. 1942), cert. denied, 318 U.S. 784, 63 S.Ct. 854, 87 L.Ed. 1151 (1943).

The trial court's censure of defense counsel for the latter's attempted impeachment of another witness through the showing of mere arrest was also justified. Further, defense counsel's persistence in this regard does not reveal the "timidity" to which the defendant has referred. We do not find that defense counsel "trimmed his sails to such a judicial wind as prevailed in the courtroom," United States v. Ah Kee Eng, 241 F.2d 157, 161, 62 A.L.R.2d 159 (2d Cir. 1957).

■ Finally, the defendant refers to a number of remarks by the assistant United States Attorney which, he says, were highly improper and inflammatory. He notes that the prosecutor called the jury's attention to the fact that Sandra Hafford was in the protective custody of the Secret Service. He contends that from this statement the jury may have drawn an erroneous conclusion about the defendant's intentions toward her. The jury, however, was well apprised of Hafford's Secret Service custody prior to the prosecutor's comment. In view of her testimony concerning her association

with Spagnoli, we do not see how the jury could have drawn the conclusion suggested by the defendant. The other comments of the prosecutor assailed by the defendant were either ambiguous or only slightly importune at best. The defendant did not object to any of these remarks and we do not believe that prejudicial error could have resulted therefrom.

## II. .

■ The defendant's next allegation of error relates to the admission into evidence, without objection, of his inculpatory remarks to Agents Martineau and Jordan shortly after his return from Washington, D.C. in Secret Service custody. The defendant contends that these statements were elicited after a request for the assistance of counsel had been denied, at a time when he was being personally accused of a crime, and that therefore the constitutional principle enunciated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), requires a reversal of his conviction. He further alleges, citing Rule 52(b) of the Federal Rules of Criminal Procedure, that this error resulted in such a substantial constitutional deprivation as to excuse his failure to object to the admissibility of the statements.

The record shows, and the Government does not dispute, that the defendant was returned from Washington to Chicago on May 18 under pretext. He was told by his superiors that he was needed for certain undercover work in connection with a counterfeiting case. Actually, he was being returned to answer the charge that he had attempted to sell a Secret Service file to Spagnoli.

The defendant testified, without contradiction, that he was taken to the Chicago Secret Service office for interrogation at approximately 5:15 p. m. and was not formally placed under arrest until shortly before midnight. More importantly, the defendant testified, again without contradiction, that early in the course of his questioning by Agent Martineau, when it became evident that he

was being accused in the Spagnoli matter, he requested the services of an attorney. He further testified that his request was not granted.

The record contains no other reference bearing upon defendant's request for an attorney. No attempt was made by the Government to contradict the defendant's testimony. In this posture, we must accept as fact: (1) that the defendant requested the aid of counsel, (2) that his request fell on deaf ears, and (3) that certain inculpatory statements were thereafter made.

The inculpatory statements themselves have already been mentioned. Both were volunteered by the defendant and were ostensibly intended to be exculpatory; however, both tended to show guilty knowledge on his part. The first statement indicated that he knew, without having been told, that the file excerpt given to Spagnoli was typewritten. The second, in response to a question from Agent Jordan, indicated that the defendant knew more about the dyeing of Sandra Hafford's hair than he had represented.

■ As previously noted, the incriminating statements were admitted into evidence without objection. No motion to suppress was ever filed. During both trials, defense counsel brought out other remarks of an exculpatory nature attributable to the defendant's period of questioning by his superiors.[4] Full opportunity was provided, particularly after the defendant was able to assess the damaging character of his statements when a mistrial was declared in his first trial, to attempt the exclusion of these statements from the jury's consideration.[5] For these reasons we hold that the defendant is precluded from raising the constitutional question for the first time on this appeal. As we said recently in United States v. Childress, 347 F.2d 448, 451 (7th Cir. 1965), "we cannot say that defendant now has a right to have us pass upon the admissibility of the * * * testimony under rule 52(b) * * *."

4. A search of the record has convinced us that the defendant's entire conversation with his superiors on May 18 was voluntary. We are not impressed by the defendant's argument that the mere presence, at one time or another, of Chief Secret Service Inspector Michael Torina, United States Attorney Edward Hanrahan, and defendant's immediate superiors compelled him to respond to questioning. It must be assumed that the defendant, as a Secret Service agent, was well aware of his constitutional right to remain silent. This knowledge, coupled with the defendant's undoubted general intelligence, belies any claim to possible coercion by the presence of these officers. The defendant's entire pattern of behavior with respect to his interrogators appears to have been one of attempted exculpation.

The voluntary character of the defendant's statements, of course, would in no way excuse the failure of the law enforcement officials to grant him an opportunity to consult with his attorney upon request. The importance of timely legal guidance to even the most sophisticated layman is unquestioned. However, the denial of a request for counsel, as a constitutional violation, must in turn be judged according to the particular circumstances in the case and by the prejudice resulting therefrom. Escobedo v. State of Illinois, 378 U.S. 478, 491, 84 S.Ct. 1758 (1964).

5. The defendant argues that when his trial counsel made certain inquiries of Government witnesses which might have served as the basis for a motion to strike his inculpatory statements, the district judge refused to permit counsel's line of questioning, "erroneously stating that it was improper because 'no confession' was involved." He refers to questions which were directed to the restraint the defendant may have been under during his interrogation in the Secret Service office. The defendant's argument that such questions demonstrate an attempt to register an objection to the inculpatory statements must be rejected. If anything, the inquiry indicates an oblique attempt to do what should have been done directly. If the defendant wished to preserve the alleged error on appeal, he should have moved to suppress prior to trial, or objected to the statements when they appeared in the testimony, or at the very least requested that they be struck from the record with a cautionary instruction to the jury.

██ It is contended on behalf of the defendant that the district judge "seriously erred in failing at that time on its own motion" to strike the inculpatory statements which defendant made to the Secret Service agents. We know of no rule that requires a trial court to strike evidence such as the evidence in question here when no objection is made to its reception during the trial. Counsel for the defendant had the duty to bring the now claimed objectionability of his evidence to the attention of the trial judge. He cannot remain silent throughout the trial and then claim error for the first time on appeal.

### III.

██ The defendant's motion for a new trial based upon newly discovered evidence has several facets. It is based, however, upon the central contention that Spagnoli was an essential Government witness who provided the only substantial corroboration for Frank Jones' testimony of the latter's conspiracy with the defendant, and that Spagnoli had committed perjury during the Bolden trial which was known to, and in part suborned by, the Government prosecutor.

Initially, it must be observed that the defendant assumes a heavy burden when he attempts to set aside the denial of his motion by the district court. The district judge made findings in support of his ruling. He presided at both of the defendant's trials and the subsequent trial of Spagnoli. He found as a fact that Spagnoli lied at his own trial and testified truthfully at the trial of the defendant. He further found that Spagnoli's attempted admission at his own trial was prompted by the fact that when "Spagnoli realized that he was going to be convicted, he testified falsely in the hopes that he could avoid a conviction * * * by casting a shadow over the prosecution and therefore avoid a possible 25 year sentence in the knowledge that even if indicted and convicted of perjury arising out of the recantation, the maximum sentence could only be five years in custody of the Attorney General." The district judge made other findings in support of this conclusion.

██ Our review is limited to whether the findings of the district judge reveal a clear abuse of discretion. As stated by the Supreme Court in United States v. Johnson, 327 U.S. 106, 111–112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1945), reversing our decision in United States v. Johnson, 149 F.2d 31 (7th Cir. 1945), "[w]hile the appellate court might intervene when the findings of fact are wholly unsupported by evidence * * *, it should never do so where it does not clearly appear that the findings are not supported by any evidence." The district judge's findings of fact on the defendant's motion for new trial, then, may not be ignored.[6]

With this in mind we turn to the specific grounds for defendant's motion for a new trial. First, it is alleged that Spagnoli testified falsely in the Bolden trial, at the suggestion of the Government prosecutor, that he was dependent upon his mother for support, whereas in fact he made his living by gambling. Spagnoli did attempt to admit this falsity, but it must be noted that he did not actually testify in the Bolden trial that

---

**6.** The defendant erroneously contends that Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), governs this case. There, upon motion of the *Government*, presenting evidence that one of its key witnesses had lied repeatedly in similar proceedings, the Supreme Court reversed a conviction of conspiracy to violate the Smith Act. The Court noted, however:

It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense * * *,

presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is "merely cumulative or impeaching" is not * * *, an adequate basis for the grant of a new trial. *Here we have an entirely different situation,* 352 U.S. at 9–10, 77 S.Ct. at 5. (Emphasis added.)

his mother supported him. He testified only that his mother supported his two children and that he was unemployed. Regardless of a possible discrepancy between this testimony and his later admission, Spagnoli's livelihood was clearly a collateral matter bearing upon his credibility. His credibility, in turn, had been adequately put before the jury. We do not believe that the jury's overall appraisal of this witness would have been substantially affected by the knowledge that he was being less than forthright concerning his source of income.

Second, it is alleged that Spagnoli lied at the Bolden trial with reference to his first contact with Agent Martineau of the Secret Service. The record amply supports the district judge's finding that the conflicting evidence with reference to the specific date of that contact was thoroughly explored at the Bolden trial.[7]

We also agree with the district judge's conclusion that, in any event, the testimony of Spagnoli was merely cumulative. Frank Jones was the key Government witness. His testimony as to the essential elements of the crime was fully corroborated by other witnesses and by certain real evidence.[8]

The defendant next asserts that his conviction must be reversed because an assistant United States Attorney made a promise to Spagnoli in exchange for the latter's testimony and thereafter failed to inform the jury of that fact when Spagnoli denied the existence of any such "deal" during the defendant's trial. The facts concerning this alleged offer of assistance were also determined by the district judge and are supported by the record.

The district judge found that the only promise made by the assistant United States Attorney was a statement that the fact of Spagnoli's testimony would be brought to the attention of the sentencing judge in Spagnoli's counterfeiting trial, the same judge who would hear his testimony in the defendant's trial. The assistant United States Attorney in question commented upon his "offer" in the following manner:

> [A]t the time I discussed this matter with Mr. Spagnoli initially * * *, I told Mr. Spagnoli that if he wanted to take a plea of guilty in this case, that the fact that he had been a witness in the Bolden case would, of necessity, be brought to the attention of the sentencing Judge, because his testimony in the Bolden case was being given before the same Judge who would eventually hear his own case. * * *

During the defendant's trial, the following colloquy occurred between the witness Spagnoli and defense counsel:

> Q. Now, Mr. Spagnoli, you say that you are indicted under case docketed as 64 CR 300 entitled United States vs. D'Antonio and others. Now I ask you if the Government or the Secret Service made any promises of immunity of any type for your testifying here?
>
> A. No, because I didn't do any of those things. That's why. I don't need nothing. I'm innocent to them charges. I didn't conspire with nobody. I don't have to have a deal.

---

7. Defense counsel sought to impeach Spagnoli's statement that he telephoned Agent Martineau on May 13 by referring to the transcript of the defendant's first trial, wherein Spagnoli testified that he had called Martineau on May 12. At that point Spagnoli attempted to explain the confusion by saying that he had called the FBI on the 12th, and the Secret Service (Agent Martineau) on the 13th. Agent Martineau testified that he received the call in question on May 13.

8. Several Secret Service agents corroborated the testimony of both Spagnoli and Jones. Other witnesses, including Jones' wife, also supported this testimony. The physical evidence included Jones' fingerprints, taken from a gin bottle in Spagnoli's apartment, the typed excerpt from the counterfeit savings bond file, and a fishing guide with Spagnoli's address on it, taken from the defendant's automobile.

Q. Nobody promised you any assistance in your indictment.

A. I don't need any assistance. I'm innocent of the charges.

Q. That is not the question, Mr. Spagnoli. I am asking you if someone promised you something.

The Court: Let his answer stand. You have the answer. Let us just go on. He is not on trial, ladies and gentlemen, in that case here. That is a mere charge as far as you folks are concerned.

The Witness: He is insinuating, your Honor, that I might have got a deal. I don't need no deal. I am innocent of them charges. I didn't do none of them things.

We do not think that the assistant United States Attorney's statement to Spagnoli prior to his becoming a witness in the Bolden trial taints the testimony recited above. Nor do we think that these circumstances imposed a duty upon the Government attorney to disclose to the court and jury his earlier comment to Spagnoli. The obvious "assistance" which had been promised cannot be considered an inducement for Spagnoli's testimony.

The defendant relies principally upon Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In that case, the principal state witness in a murder trial, who was then serving a 199-year sentence as an accomplice in the same murder, testified that he had received no promise of consideration in return for his testimony. In fact, an assistant State's Attorney had promised to recommend a reduction in the witness' sentence, and did nothing to correct the testimony. The Supreme Court held that the knowing permission of such false testimony was a denial of due process under the fourteenth amendment.

The statement made to Spagnoli in this case did not amount to such an affirmative promise of assistance as was condemned in Napue. Pointing out to Spagnoli the obvious fact that his testimony as a Government witness would be given before the same judge who would sentence him upon a plea of guilty and then remaining silent while Spagnoli vigorously proclaimed his innocence and denied having made a "deal" do not, we think, constitute either a dangling of reward or a knowing permission of perjury on the part of Government counsel.

■ The defendant's final contention is that Spagnoli's conviction of counterfeiting, a crime for which he was indicted prior to the indictment of the defendant, is newly discovered evidence which should have been available for impeachment purposes during defendant's trial to enable the jury to more accurately determine Spagnoli's credibility. This contention must also be rejected. Spagnoli's indictment for counterfeiting was exposed and his credibility was thoroughly examined at the defendant's trial. His subsequent conviction was merely cumulative and impeaching. Under these circumstances the district judge did not abuse his discretion in denying the motion for new trial. Murphy v. United States, 91 U.S.App.D.C. 118, 198 F.2d 87 (1952); United States v. Mentesana, 203 F.Supp. 63 (E.D.N.Y.), aff'd, 305 F.2d 214 (2d Cir. 1962), cert. denied, 375 U.S. 848, 84 S.Ct. 102, 11 L.Ed.2d 75 (1963). Moreover, Spagnoli's conviction was not evidence that was in existence at the time of the defendant's trial and therefore did not constitute evidence upon which a new trial could be based.

The order denying the motion for a new trial is affirmed. The judgment of conviction is affirmed.