STATE OF NORTH CAROLINA v. WILLIE LOUIS McLEAN

No. COA06-216

(Filed 6 February 2007)

**Constitutional Law— right to impartial jury—improper comments by trial judge**

The trial court erred in a conspiracy to commit armed robbery, attempted armed robbery, three counts of armed robbery, and first-degree murder case by its actions and comments regarding defense counsel both in and out of the presence of the jury, and defendant is entitled to a new trial, because the cumulative effect deprived defendant of his constitutionally guaranteed right to a fair and impartial trial.

STATE v. McLEAN

[181 N.C. App. 469 (2007)]

Appeal by Defendant from judgments entered 4 March 2005 by Judge Evelyn W. Hill in Wake County Superior Court. Heard in the Court of Appeals 31 October 2006.

*Attorney General Roy Cooper, by Special Deputy Attorney General Diane A. Reeves, for the State.*

*Nora Henry Hargrove for Defendant-Appellant.*

STEPHENS, Judge.

Willie Louis McLean ("Defendant") appeals from judgments entered upon his convictions of conspiracy to commit armed robbery, attempted armed robbery, three counts of armed robbery, and first-degree murder. For the reasons stated herein, we conclude that Defendant is entitled to a new trial.

At trial, the State's evidence tended to show the following: On 1 November 2002, crew members working maintenance with the City of Raleigh were "pitching quarters" at the shop while waiting for their shift to end. At approximately 11:30 p.m., two young men walked into the shop. The larger of the two was wearing a yellow shirt, and the other man had on a gray hooded sweatshirt. The man in the yellow shirt was firing a handgun as he came through the door and told the crew members to "give up [their] wallets." During the robbery, Robert Saiz, a supervisor, was shot and killed as he attempted to flee through a back door. Later, Decarus Vinson, one of the robbery victims, identified Defendant's cousin, Dwight McLean ("Dwight"), in a photographic array as the shooter. Mr. Vinson testified that the man in the gray sweatshirt kept his face covered with the hood. That individual gathered all of the wallets and took them away. Mr. Vinson said he had over $500 in his wallet because 1 November 2002 was payday and he had cashed his check. Mr. Vinson further testified that he observed his co-workers surrender their wallets to the robbers.

In pretrial proceedings and at trial, Mr. Vinson described the individual who gathered up the wallets as being of similar weight and size as Defendant. He also testified that Defendant was the same size, relative to Dwight, as the second robber. However, none of the eyewitnesses was able to positively identify Defendant as the second robber because that individual kept his face covered.

Following a track from the crime scene, a Raleigh police officer and his K-9 dog found the discarded yellow shirt and hooded sweatshirt, which smelled like gunpowder, on the ground. The track led

them further to the driveway area of the Timber Lake Apartment complex, where the dog lost the scent. A resident of the complex, Mr. Newkirk, testified that late on the night of 1 November 2002, he was outside talking on his cell phone when he was approached by two men who asked to use his phone. He directed them to the pay phone at the complex. Mr. Newkirk identified Dwight from a photographic lineup as the taller of the two men who approached him. He testified that Defendant's size and complexion closely resembled the other man, but he was unable to identify Defendant in the photographic lineup.

Similarly, a cab driver who picked up two young men from the Timber Lake Apartments around midnight on 1 November 2002 subsequently identified Dwight as the bigger of the two, but did not get a good look at the shorter, smaller man and did not identify Defendant as one of the two men he picked up. He took the two men to a gas station near another apartment complex where Dwight's mother lived.

Cherrie McLean, Defendant's and Dwight's cousin, testified for the State that, a few days after 1 November 2002, she drove Defendant and Dwight to Durham. Ms. McLean said that, on the way, Dwight began to cry. When she asked him what was going on, he replied that he should never have done what his uncle, Louis McLean ("Louis"), asked him to do, and that he "didn't mean to shoot the man." Ms. McLean asked Dwight what he was talking about, and he told her that Louis had asked him and Defendant to "rob his job[.]" Dwight said that Louis gave him the gun and that, while he was shooting to try to "scare people[,]" Defendant was going around picking up Louis's co-workers' wallets. He told her that Louis had had a disagreement with Robert Saiz and "wanted revenge." He also mentioned that he and Defendant got away in a cab that took them to a gas station. Ms. McLean testified that Defendant did not protest or dispute any of Dwight's statements.

Ms. McLean gave this information to a Raleigh police detective after she was arrested in January 2003. She was in jail and hoping to get out when her attorney asked her if she knew anything about the robbery and murder. After speaking with her, the attorney talked to law enforcement officers and the District Attorney's office on Ms. McLean's behalf. Ms. McLean then gave a recorded statement describing her trip to Durham with Dwight and Defendant. She subsequently entered into a plea agreement "to take care of" all the cases pending against her in Wake and Durham Counties. She received a probationary sentence in exchange for her plea.

On cross-examination, Ms. McLean testified that after being arrested, she requested pretrial release because she had a three-year-old child and was pregnant, but her request was denied. Her attorney told her the State would not drop or reduce the charges against her because that had already been done for her in the past. After providing information about the robbery and murder, however, she was placed on pretrial release. On the same day she got out of jail, she spoke to a private investigator and told him she had been mad at Defendant when she gave the information to law enforcement authorities, that she had falsely accused him of being involved in the robbery and murder, and that she did so because of her anger at him and because she thought her accusation would help her get out of jail. Ms. McLean also agreed on cross-examination that she and Defendant did not get along and had had "run-ins" in the past.

On the basis of Ms. McLean's recorded statement, Defendant was arrested and charged with the crimes. He voluntarily gave blood and hair samples shortly after his arrest. An agent of the State Bureau of Investigation compared a hair taken from the gray sweatshirt to a sample of both Dwight's and Defendant's hair, but no match was made. Another agent performed a DNA analysis of cuttings taken from the yellow shirt and the gray sweatshirt. His comparison of blood samples from Defendant and Dwight to skin cells from the cuttings established that whereas the DNA on both pieces of clothing came from more than one individual, the predominant profile on the yellow shirt came from Dwight, and the predominant profile on the gray sweatshirt matched that of Defendant. The age of the DNA on the shirts could not be determined.

Raleigh police detective Randy Miller testified that after Defendant was arrested, he stated that his uncle, Louis, had called him and asked him to rob Louis's co-workers, but Defendant had not answered the request. Detective Miller testified further that Louis told law enforcement authorities that Dwight was the shooter, but he did not identify Defendant as being involved.

Testifying on behalf of Defendant were his father, Willie Caldwell; his father's fiancé, Cornelia Peterson; and her daughter, Towanda Peterson. Defendant, who does not work, does not drive, and receives social security disability benefits based on a mental disability, lived with his father, as did Cornelia. All three witnesses testified that Defendant was at home on the night of 1 November 2002. Mr. Caldwell and Ms. Peterson arrived home from work about 11:00 p.m.

STATE v. McLEAN

[181 N.C. App. 469 (2007)]

to find Defendant, Ms. Peterson's two daughters, and Towanda's children there. Defendant was watching television and did not leave the house after his father got home. Towanda testified that she and her children had gone to the mall with Defendant, where he purchased a new pair of white Nike tennis shoes with his social security check that had come in the mail that day, and that they got back home around 9:00 or 10:00 p.m. Mr. Caldwell and Ms. Peterson testified that Defendant sometimes wore other people's clothes. Neither had ever seen him wear the gray sweatshirt.

None of the defense witnesses had contacted any law enforcement authorities regarding Defendant's alibi after he was arrested.

Upon Defendant's convictions on all charges, the trial judge imposed a sentence of life imprisonment without parole for the first-degree murder conviction, three consecutive sentences of 64 to 86 months for each of the armed robbery convictions, a consecutive sentence of 25 to 39 months for the conspiracy conviction, and a consecutive sentence of 64 to 86 months for the conviction of attempt to commit robbery with a dangerous weapon. Defendant appeals.

By his first assignment of error, Defendant argues that certain actions and comments of the trial judge, both in and out of the presence of the jury, deprived him of a fair trial and violated his rights to due process. Based upon a thorough review of the trial proceedings, and for the following specific reasons, we agree and, thus, remand for a new trial.

It has been repeatedly acknowledged by this Court and our Supreme Court that every criminal defendant is entitled to a trial " 'before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm.' " *State v. Staley*, 292 N.C. 160, 161, 232 S.E.2d 680, 681 (1977) (quoting *State v. Lynch*, 279 N.C. 1, 10, 181 S.E.2d 561, 567 (1971), and *State v. Carter*, 233 N.C. 581, 583, 65 S.E.2d 9, 10 (1951)). "A trial judge occupies an esteemed position whereby ' "jurors entertain great respect for [a judge's] opinion, and are easily influenced by any suggestion coming from him. As a consequence, he must abstain from conduct or language which tends to discredit or prejudice" any litigant in his courtroom.' " *State v. Brinkley*, 159 N.C. App. 446, 447, 583 S.E.2d 335, 337 (2003) (quoting *McNeill v. Durham County ABC Bd.*, 322 N.C. 425, 429, 368 S.E.2d 619, 622 (1988) (quoting *State v. Carter*, 233 N.C. at 581, 65 S.E.2d at 10)). Because of the exalted status jurors accord the trial judge,

"he must not forget that the jury hangs on his every word and is most attentive to any indication of his view of the proceedings. *Thus repeated indications of impatience and displeasure of such nature to indicate that the judge thinks little of counsel's intelligence and what he is doing are most damaging to a fair presentation of the defense.*"

*Staley,* 292 N.C. at 163, 232 S.E.2d at 683 (emphasis added) (quoting *United States v. Ah Kee Eng,* 241 F.2d 157, 161 (2nd Cir. 1957)). Indeed, our Supreme Court has cautioned that "*[a]ny* expression as to the merits of the case, or *any* intimation of contempt for a party or for counsel may be highly deleterious to that party's position in the eyes of the jury." *Staley,* 292 N.C. 162, 232 S.E.2d at 682 (emphasis added). Therefore, the trial judge "should be the embodiment of even and exact justice. He should at all times be on the alert, lest, in an unguarded moment, something be incautiously said or done to shake the wavering balance which, as a minister of justice, he is supposed[] . . . to hold in his hands." *Withers v. Lane,* 144 N.C. 184, 191-92, 56 S.E. 855, 857 (1907).

We also recognize, however, that " 'not every improper remark made by the trial judge requires a new trial. When considering an improper remark in light of the circumstances under which it was made, the underlying result may manifest mere harmless error.' " *Brinkley,* 159 N.C. App. at 447-48, 583 S.E.2d at 337 (quoting *State v. Summerlin,* 98 N.C. App. 167, 174, 390 S.E.2d 358, 361 (citation omitted), *disc. review denied,* 327 N.C. 143, 394 S.E.2d 183 (1990)). That is, "[i]n evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized. Unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless." *State v. Larrimore,* 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995). On the other hand, "[e]ven if it cannot be said that a remark or comment is prejudicial in itself, an examination of the record may indicate a general tone or trend of hostility or ridicule which has a cumulative effect of prejudice." *Staley,* 292 N.C. at 165, 232 S.E.2d at 684 (citations omitted).

In this case, Defendant cites multiple examples which, he argues, establish that the trial judge "harassed and belittled" defense counsel, "stunted" cross-examination of the only witness, Ms. McLean, who identified him as being involved in the crime, "vouched for" Ms. McLean's credibility, and "eviscerated" closing argument. While we

find each example identified by Defendant to be a troubling indication that the trial judge too often freely abandoned her role as the impartial arbiter of the proceedings, we are persuaded that the cumulative effect of the judge's actions and comments deprived Defendant of his constitutionally guaranteed right to a fair and impartial trial. In particular, the following actions of the trial court, which occurred in front of the jury, constitute conduct or language which tended to discredit or prejudice Defendant's case:

During cross-examination of Ms. McLean, clearly the State's "star" witness in its otherwise rather tenuous case against Defendant, defense counsel sought to question her about her use of a false birth certificate to obtain identification from the Division of Motor Vehicles and, subsequently, to use the false identification she had thus obtained to buy furniture. With no objection to this line of questioning from the State, the trial judge nevertheless interrupted defense counsel, sustained her own objection to his questions, and admonished counsel as follows: "I think we've gone far enough, counsel, unless you'd like to approach the bench and tell me what the relevance is in trying another case in this court." When counsel attempted to answer the judge, she interrupted him again and said: "I said approach the bench and tell me, you don't sit out there and tell me." Following an unrecorded bench conference, defense counsel resumed his cross-examination of Ms. McLean regarding her use of a false identification and, again, with no objection to counsel's questions from the State, the trial judge interrupted counsel with the following additional admonition:

> THE COURT: Sustained. We've had this conversation at the bench, Mr. Kelly. . . . We're not going to try other crimes. You know what the rules are. I've allowed you a wide latitude because the State hasn't objected, but there comes a point when the Court is going to sustain an objection that isn't there.
>
> MR. KELLY: Can I be heard, Your Honor?
>
> THE COURT: No[.]

Counsel continued his cross-examination of Ms. McLean regarding her prior convictions, shortly eliciting yet another reproof from the judge, unsolicited by way of objection from the State: "Mr. Kelly, you know the right way to do this. Do it the right way. Editorial remarks like saying additionally and another is not proper." After two more questions about the witness's prior larceny convictions, defense counsel once again found himself rebuked by the judge when he

attempted to establish that the convictions to which Ms. McLean had just admitted occurred in a certain county: "Just move on to a new area. If you're not going to ask the questions properly, just move on to a new area." Counsel then started to ask Ms. McLean if she had been convicted of unauthorized use of a motor vehicle a second time in Johnston County, leading the judge to interrupt the question before he completed it and command: "Approach the bench. Didn't I just say if you're not going to ask it properly?" On neither occasion had the State objected to defense counsel's questions. After this bench conference, the judge took over questioning of Ms. McLean regarding her prior convictions by showing her a list of prior convictions compiled by the prosecutor, asking her if she admitted committing the convictions on the list, and ending further cross-examination of Ms. McLean on the matter.

In addition to sustaining her own objections to defense counsel's cross-examination of this State's witness, the trial judge found it necessary to chide counsel when she ruled on objections made by the prosecutor. For example, while cross-examining Ms. McLean as to whether she had falsely accused an individual of rape, defense counsel asked her if she had "brought rape charges" against the man. The prosecutor's objection was sustained, accompanied by the following reprimand from the judge: "Only the State of North Carolina can bring rape charges, Mr. Kelly, you know that." Further, when counsel asked Ms. McLean about her pretrial release and the agreement she signed in connection with that release, he characterized the arrangement as follows: "[Y]ou signed your name to an agreement, you don't have to put up any money and you get out of jail; is that right?" Once again, with no objection lodged by the State, the judge jumped in the fray anyway: "Sustained as to inaccurate description. You signed your name to an agreement, but there's a lot in that agreement, Mr. Kelly."

The judge continued her scolding of defense counsel outside the presence of the jury as well. For example, when he attempted to make a record of the answers of Ms. McLean to the questions that the judge would not allow him to ask in the jury's presence, the judge demonstrated her impatience and reproach as follows:

MR. KELLY: I wanted to take some of her answers [on] the record, . . .

THE COURT [interrupting]: Mr. Kelly, the jury is waiting to go to lunch. They're sitting in the jury room. If you've got something for the record, say it.

MR. KELLY: I will do it real quick. I want to take some answers for the record. We're—

THE COURT [interrupting]: You said you wanted to be heard. I'm sitting waiting to hear you.

When defense counsel explained that the specific evidence he wanted to cover was his questions and Ms. McLean's answers regarding false and fraudulent statements related to her use of false identification, the judge heard argument from the prosecutor and denied defense counsel's request. Counsel told the court again that he wanted to put the witness's answers on the record, leading the judge to launch into a discussion of what she would not permit counsel to do with other witnesses, a topic that had not been raised by counsel. After letting Mr. Kelly know, in no uncertain terms, that "we're not going into these matters with other witnesses of yours," the judge finally turned her attention to his previous, straightforward request to put Ms. McLean's answers on the record, by stating: "You may ask this witness whatever questions you have to ask while the jury knows their [sic] out because you asked them to go out. So take your time." Plainly, the judge was telling defense counsel that the jurors, whom she had already reminded him were waiting to go to lunch, would blame him for having to wait in the jury room while he delayed their lunch by putting Ms. McLean's testimony on the record.

During his efforts to record the witness's answers to his questions about her use of false identification, the judge again sustained her own objection to a question, criticizing counsel as she did as follows: "[The witness] has certain fifth amendment rights. You might be familiar with the Fifth Amendment as a defense attorney." The judge then decided that defense counsel's questioning of the witness was over, asserting: "Let's bring the jury back. We're finished with this."

Further, the judge repeatedly interrupted defense counsel's closing argument, at one point inserting an instruction and advising the jury that she was giving them the instruction "so you have the context [for] his remarks." Upon concluding her remarks, the judge asked the jurors if they could "see the difference" between the instruction she gave and counsel's argument, even though at the point she interrupted him, he was arguing only what he contended the evidence showed regarding Ms. McLean's false statements. In addition, and more concerning, when counsel argued that Ms. McLean was "the one witness in this case with a prior record[,]" the judge interrupted and said, *"That's not true, Mr. Kelly."* After a bench conference, counsel

changed his argument to state that Ms. McLean was the only witness with a criminal record "in terms of the evidence of this trial." No evidence was offered at the trial of this case that any witness other than Cherrie McLean had a prior criminal record. By telling the jury that defense counsel's observation to that effect was "not true," the judge clearly gave the impression that other witnesses in the case had prior criminal records. This impression could easily have extended to Defendant, particularly since he did not testify.

The State argues that whereas the trial judge "may have been short-tempered at times," may have been "sarcastic or belittling of defense counsel," and her conduct of the trial "was not always reserved and decorous[]"—"stylistically typical of this judge's conduct"—the effect of her "unorthodox" style was "isolated" and, even considering her remarks and conduct cumulatively, Defendant's trial was not unfair. We cannot agree. While, in isolation, examples of the judge's treatment of defense counsel may not warrant a new trial for Defendant, we cannot say that, taken together, the judge's conduct and statements did not cause defense counsel to " 'trim[] his sails to such a judicial wind as prevailed in the courtroom during this trial, and thus have jeopardized the rights and the proper interests of a defendant on trial for a serious felony.' " *Staley*, 292 N.C. at 163, 232 S.E.2d at 683 (quoting *Ah Kee Eng*, 241 F.2d at 161). Because we cannot rule out such an effect on defense counsel's representation of Defendant's interests, Defendant is entitled to a new trial, free of partiality and prejudicial conduct.

Moreover, although we are constrained to accept "the fallacy of imputing a certainty of meaning and significance to the written word[,]" *Staley*, 292 N.C. at 166, 232 S.E.2d at 684, our close review of the written record in this case convinces us that the trial judge's repeated, chiding words to defense counsel, in and out of the presence of the jury, created a general tone of disdain and, thereby, "[shook] the wavering balance" of the scales of justice the judge was holding in her hands. *Withers*, 144 N.C. at 191-92, 56 S.E. at 857. We are persuaded that, instead of guarding their even balance, the judge put her thumb on the scales, tipping them in the State's favor. For this reason as well, Defendant is entitled to a new trial.

Because we reverse and remand for a new trial based on Defendant's first assignment of error, we do not reach Defendant's remaining assignments of error as we find it unlikely that the errors thereby argued are likely to recur.

NEW TRIAL.

Judges WYNN and HUDSON concur.

The judges concurred in this opinion prior to 31 December 2006.